Sydney F. Foster, J.
This is a proceeding, under article 78 of the CPLR, to annul an order of the State Superintendent of Public Works which would require petitioner to make certain changes to its hydraulic canal complex adjacent to West Canada *128 Creek in Herkimer County. The order was purportedly issued pursuant to the provisions of section 948 of the Conservation Law. This section provides generally that whenever the Superintendent of Public Works finds that public safety requires the removal, repair or reconstruction of a structure for impounding water in a natural stream or watercourse he may direct the owner to make such change or changes, and the latter may be subject to drastic penalties for failure to obey. In addition to the pleadings and affidavits submitted oral proof was taken before the court.
The canal complex, so-called, of petitioner is of ancient vintage. In 1833, by legislative enactment (L. 1833, ch. 165), the Herkimer Manufacturing and Hydraulic Company was given the right to construct and maintain a canal by diverting water from West Canada Creek and discharging the same into the Mohawk River, or West Canada Creek, at such place it might be deemed most convenient. In 1836, such a canal, known as the Herkimer Hydraulic Canal, was constructed, and maintained in its present course by various owners ever since for industrial purposes. It is approximately two miles in length from the diversion point to where it enters the Mohawk River, and a considerable portion of it runs through the Village of Herkimer.
The canal begins at a point in West Canada Creek just north of the Village of Herkimer at a place where petitioner owns lands on both sides of the creek. This is the site of the so-called diversion dam which diverts water from the creek through a gated structure at the west end of the dam into the canal. The gated structure has 5 manually controlled gate passages, each of which is 5 feet wide and 6 feet high, or 3 feet wide and 5 feet in height (the testimony varies). The creek at this point is about 300 feet wide, and the amount of water which runs in the creek as opposed to that which is diverted to the canal is about 30 to 1.
From the diversion dam water flows through the canal closely parallel to the creek for a distance of about 1,000 feet, and here the channel is about 40 feet wide and 5 feet deep. Colloquially this is known as the “ Ice Chute ”, and at the end thereof there is a weir or safety spillway, about 15 feet wide, with wooden stop logs, which, when lifted, will permit the sluicing of ice and the discharge of water back into the creek when necessary.. At this point such an operation is feasible because here the canal runs very close to West Canada Creek.
A short distance from the so-called safety spillway the canal turn's to flow in a southwesterly direction, at a considerable angle away from the creek, for a distance of approximately 3,000 feet, *129 and then discharges into a small artificial body of water known as Mirror Lake. This lake covers an area of from 25 to 30 acres, and was created by the construction of dikes at the time the canal was originally built. A't a point near the downstream end of this lake there was a structure through which water at one time could have been discharged back into West Canada Creek through a small swampy lake, known as Mud Lake. The stop gates at this point have apparently been closed for a long period of time. The respondent has found that the gated works at this former outlet have been removed and the outlet filled in with earth. The order complained of contemplates the reactivation of this former outlet, and possibly a gated structure at the end of the lake.
From the southerly end of Mirror Lake the canal continues for a distance of approximately 2,000 feet to a dam at petitioner’s factory site. This dam creates a pond, apparently a rather small one, which provides some storage of water. At one side of the dam there is a spillway about 15 feet in width, which is equipped with manually operated headgates. There is also a penstock approximately 10 feet in diameter which provides water from the pond to operate a turbine. The head of water at petitioner’s plant is about 20 feet. Petitioner uses the water both for processing a species of pulp texture and also for power purposes. After use at the side of petitioner’s plant the waters of the canal formerly flowed without interruption into the Mohawk River at a point about 3,000 feet above the confluence of West Canada Creek with the river.
The chief business of petitioner at its canal plant is the production of molded pulp egg cartons, and it is said to have a capacity of some 240,000 cartons a day. It uses approximately 10,000,000 gallons of water per day for processing these articles. Petitioner also has at its plant hydroelectric power producing machinery which utilizes about 300,000,000 gallons of water per day for power purposes.
This completes a rough description of the canal, and the use to which it is put by petitioner; except it may be added that apparently the Village of Herkimer has storm sewers which empty into the canal at certain places. By what authority this condition came into existence does not appear. The fact however is significant, for whatever difficulties the Village of Herkimer has had with surface water runoffs apparently have been largely due to water backing up in such storm sewers, apart from flood waters in West Canada Creek and the Mohawk River.
During its existence for upwards of a century and a quarter, and its use for various commercial purposes, the canal and its *130 equipment do not seem to have been the focus of any serious criticism on the part of any governmental divisions of the State, and there is no substantial proof to the effect that any part of the canal or its equipment ever gave way so as to cause flooding of adjacent property. However, there is proof that flood waters from West Canada Creek and the Mohawk River have caused damage in the Herkimer area at various times.
In March, 1961, a flood control project for the area adjacent to the Village of Herkimer, including the Mohawk River and West Canada Creek, was designed by the U. S. Army Corps of Engineers. This was to be a joint project of the Corps of Engineers, the State of New York through its Department of Public Works, and the Village of Herkimer, with the Corps of Engineers acting merely in an advisory capacity. The plans contemplated the construction of a levee along the Mohawk River and the utilization of a levee along the west bank of West Canada Creek, already in existence at the time the plans were made, and apparently the construction of additional levees in sections. The levee along the Mohawk River would necessarily cross the canal where the latter entered the river, and this crossing was to be accomplished by the construction of a concrete hand-operated structure consisting of five sluice gates with automatic flood gates installed at the river end of the canal. There was also to be installed a storm-water pump station at the junction of the canal and the levee, with provision for an automatic drainage gate through the upper section of the levee. Although the general design memorandum of the U. S. Army Corps of Engineers is replete with technical data and maps, scarcely intelligible to the layman, it can be envisaged that the structures just mentioned are designed to control the flood waters of the Mohawk River, and its tributary West Canada Creek.
Another consideration however was involved. To the west or northwest of the Village of Herkimer and the canal there is a drainage area of hilly countryside, some 1,352 acres, which empties into the upper reaches of the canal and Mirror Lake. At times of melting snows and heavy rainfall a considerable amount of surface water would flow into the canal and be diverted from the Village of Herkimer and carried into the Mohawk River. This was prior to the construction of a levee, with automatic gates, on the north shore of the Mohawk River in conformity with the design of the U. S. Corps of Engineers for a flood control project. A levee on West Canada Creek, constructed about the year 1912, was designed to control water *131 in that stream when the same was in spate, and apparently additional levees or sections were to be bnilt under the plans for the same purpose. The levee along the north shore of the Mohawk Eiver was designed, so the plans and the testimony indicate, to control the flood waters of that river. However these structures in no way assist surface water drainage from the hilly area previously mentioned through the canal and into the Mohawk Eiver. As a matter of fact such drainage is blocked off by the levee constructed on the north shore of the Mohawk Eiver at the point where the canal enters the river. The control gates in this levee are designed to close automatically, as I understand the plans and testimony, when the Mohawk Eiver is in a flood stage. The pumping facilities provided at this point can take care of approximately 20,000 gallons a minute, which is inadequate, according to proof which is not disputed. The original plan of the U. 8. Corps of Engineers for instance called for a pumping station at this point with a capacity of 128,000 gallons per minute, which was not adopted for economic reasons.
Thus, in addition to making provisions for protection against high water in the Mohawk Eiver and West Canada Creek, some other provision had to be made to carry off surface waters which would otherwise flow to them, but the flow of which is now blocked. The design of the Army Corps of Engineers makes it rather clear that petitioner’s canal was to serve that purpose in the flood control project. Although the general design memorandum is the best proof on that subject there is other significant evidence to the same effect. Before the order complained of was issued by the Superintendent of Public Works, discussions were had between representatives of the State, the petitioner and the Army Corps of Engineers concerning the proposed plans for flood control in the Mohawk-Herkimer area, and the part the canal was to play in the project. Among other things the general plan for the use of the canal in the flood control project, as stated both by a State engineer and a representative of the Army Corps of Engineers, provided for the reconstruction of certain existing facilities on the canal. The intake structure at the west end of the diversion dam was to be reconstructed, and also the emergency spillway at the end of the so-called “ Ice Chute ” was to be reconstructed. Also a gated structure was to be built at Mirror Lake in order to be able to reverse the flow of the canal into West Canada Creek at the safety spillway location. Free-board along the banks of the canal in certain places was to be raised three feet above its present level. By freeboard was meant the distance vertically from the water surface of the canal *132 to the top of its embankments. The general purpose - of these proposed changes was to utilize the canal at any time the Mohawk River reached a certain level as a sewer to divert the ■storm-water runoff from the steep terrain to the west of the canal by reversing the flow in the canal above petitioner’s mill pond so that such surface water would be carried into West Canada Creek.
. Apparently this would be feasible so far as the discharge of ■ such water through the safety spillway at the end of the 1 ‘ Ice Chute ’’ is concerned, because, as heretofore pointed out, the canáíAt such'point is very close to the banks of the creek. But so far as reactivating the former outlet through the bank of Mirror Lake so as to discharge such excess water into Mud Lake, and thence into West Canada Creek, is concerned, there is cogent engineering testimony to indicate that this is not feasible because the .water would be blocked by the levee on the west bank of West ■Catthda Creek, and other structures, from entering that stream. The' only feasible alternative, so the testimony runs, would be to construct a large conduit from Mirror Lake to West Canada Creek, and this at great expense.
Of course it follows that whenever the flow in the canal is reversed petitioner’s supply of water would be shut off to such an extent that it could not produce power to operate its mill. The cost of these changes is in dispute, as the oral testimony indicates, but in any event it was substantial and ranged from $100,000 to $200,000 for changes other than the construction of a conduit.
Apparently the State offered to make these changes at its own expense providing petitioner would consent to them and grant an entry permit to go upon petitioner’s premises for such purpose. This offer was refused by petitioner on the ground that the changes in the canal and its structures would compel petitioner to shut down its mill, and stop production, for unknown periods of time which might be as long as a month under unusual conditions because of high water in both the Mohawk River and West Canada Creek. This, asserted petitioner, amounted to an appropriation of its water rights, and took away from it the control of the canal, for which no compensation was provided.
The last of these conferences was held December 27, 1962. Sometime later in 1963 a field engineer made an inspection of the canal complex under the direction of the Superintendent of Public Works, and on the basis of su'ch engineer’s report the Superintendent, acting under the purported authority of section 948 of the Conservation Law, issued an order directed .to petitioner.
*133 The order, dated January 23,1964, required petitioner to make certain changes in its canal which may be briefly stated as follows:
1. To reconstruct the intake gated structure and operating machinery which directs the flow from the diversion dam into the canal.
2. To reconstruct or repair the by-pass weir located about 1,000 feet below the diversion dam.
3. To reconstruct and reactivate the former relief spillway at the southerly end of Mirror Lake, or, if reactivation is impractical, to provide an alternate regulating, works which will provide adequate control of the runoff from upland area draining into the hydraulic canal and Mirror Lake. In default thereof the State would construct a gated structure at the southerly end of Mirror Lake.
4. To reconstruct and repair the dam and control gates at petitioner’s manufacturing plant.
5. To repair the embankments retaining Mirror Lake and any sections of the canal where leakage and erosion are occurring.
These changes are substantially the same as those contemplated by the design of the Army Corps of Engineers.
The petitioner has failed to comply with this order, and instead brought the instant proceeding to have the order annulled. Thus the issue is reached of whether the order was a proper exercise of power on the part of the Superintendent of Public Works under the facts and circumstances revealed in the record and under the statute invoked.
Section 948 of the Conservation Law so far pertinent here, provides:
1 ‘ § 948. Structures for impounding waters; dams and docks; control of
“ (1) No structure for impounding water, including any artificial obstructions, temporary or permanent, in or across a natural stream or water course, nor any dock, pier, wharf or other structure, temporary or permanent, used as a landing place on waters shall be erected, reconstructed or repaired by any person or public corporation without notice to the Superintendent of Public Works. * * *
“ (3) (a) The Superintendent of Public Works, whenever in his judgment public safety requires, shall cause investigations and reports to be made of the structures located in the waters of the state. The Superintendent of Public Works shall have power to make and serve an order, setting forth therein his findings of fact and his conclusions therefrom, directing any person or public corporation, erecting, reconstructing, repairing, main *134 taining or using any structure hereinbefore described in subdivision (1), to either remove the said structure or to erect, reconstruct or repair the same within such reasonable time and in such manner as shall be specified in said order, and it shall be the duty of every such person or public corporation to obey, observe and comply with such an order and with the conditions therein prescribed.”
From the foregoing language, which is clearly that of regulation and not of appropriation (see 1961 At'ty. Gen. 49), it is somewhat dubious whether the section covers any part of petitioner’s canal property except the diversion dam, and the water impounded there is trifling. The only function it performs is exactly what the term implies — the diversion of water. The State’s own engineers have said it presents no hazard to the safety of persons or property below it. Of course if the term ‘£ water course ’ ’ is construed to mean something other than a ££ natural water course ” then certain parts of the canal, notably Mirror Lake and the dam at petitioner’s plant may be found to come within the statute. Assuming that such a construction should be placed upon the statute, the question remains whether the order made by the Superintendent was motivated solely by dangers inherent in the canal itself, or whether it was designed to compel the use of the canal as a storm sewer of the flood control project. No one denies the proposition that the State in the exercise of the power of eminent domain has the right to take petitioner’s property, the control thereof or any property right therein, for a flood control project, for such a project is obviously for a public use and purpose, but this may not be done under the guise of regulation. It seems a bit thick to compel the use of the canal as a storm sewer adjunct of the flood control project and at the same time force petitioner to expend upwards of $100,000 to fix up the canal for that purpose, all without compensation.
The conclusion is compelling, I believe, that the order of the Superintendent was designed to compel the use of the canal as a part of the flood control project as conceived by the U. S. Army Corps of Engineers, and not because of any inherent dangers in the canal itself separate and apart from that project. It would be easy of course to say that the police power of the State may bo invoked in any case where flood waters arc involved, and toss the proceeding off on that basis. But this would not do justice to all the factors involved in this particular case. The limits of police power may be extensive, although ill-defined, but common justice requires that such power should not be used to circumvent the constitutional inhibition against appropriating *135 private property for a public use without compensation. (For a discussion of the police power concept, see Health Dept, of the City of N. Y. v. Hector, Churchwardens $ Vestrymen of Trinity Church, 145 N. Y. 32.) The facts, however, developed in this proceeding are peculiar to themselves. There is no other case precisely like it in this State that has been cited or that I have been able to find — ■ which makes the citation of purported authorities rather .meaningless. I take note however that in one case an award was allowed against the State where in the execution of a flood control project a riparian owner’s business was interrupted (Clough v. State of New York, 208 Misc. 499, app. dsmd. by stipulation, 2 A D 2d 648).
It may be argued also that the order complained of is an administrative order, based upon the findings of a State engineer, which has some substantial basis to support it and hence is beyond interference by the courts. This is the familiar argument used to defend so many administrative orders, but the rule has its limitation. It cannot be applied legitimately where the power of the administrative officer is challenged, or to put it perhaps more accurately, it cannot be applied until the power of the administrative officer is established. Such is precisely the situation presented here. The Superintendent of Public Works has purported to act under a specific statute that provides for regulation and not appropriation. However, his order and the findings upon which it is based are geared to the necessity of using petitioner’s hydraulic canal as an integral part of the flood control project for the purposes of a storm sewer. If carried out it would operate to deprive petitioner, in part at least, of its control of the canal, and in all probability materially injure its business. Much more is involved than mere inconsequential damages. To attempt to apply the substantial evidence rule in this situation would avoid the prime issue at stake, which is whether the order is tantamount to appropriation rather than regulation.
For the foregoing reasons I am constrained to hold that section 948 of the Conservation Law was never intended to apply to the situation presented, and that the order in question was improperly issued and should be annulled, with $50 costs and disbursements.
Submit judgment accordingly.
All motions to strike out testimony are denied and the respondent may have an exception to such ruling.