HOSPITAL ASSOCIATION OF NEW YORK STATE et al., Appellants,
v DAVID AXELROD, as Commissioner of Health of the State
of New York, et al., Respondents.

Third Department, October 29, 1985

**APPEARANCES OF COUNSEL**

*Segal & Sherrin* (*Jeffrey J. Sherrin* of counsel), and *Proskauer, Rose, Goetz & Mendelsohn* (*Larry M. Lavinsky* of counsel), for appellants.

*Robert Abrams, Attorney-General* (*Betsy Broder, Robert Hermann* and *Peter H. Schiff* of counsel), for respondents.

## OPINION OF THE COURT

LEVINE, J.

In the spring and early summer of 1985, New York's medical community engaged in a strenuous public campaign for substantive and procedural reform of the State's medical malpractice liability system. In several parts of the State, the protests were so intense that physicians engaged in slow-downs and refusals to provide other than emergency services. Among the concerns particularly expressed were the rapid escalation of malpractice insurance premium rates and a trend in jury awards in malpractice cases which practitioners believed exposed them to the risk of being held liable for amounts well in excess of the generally available $1 million/ $3 million limits of insurance coverage. The Legislature took up these concerns and, in the closing days of the 1985 session, enacted the Medical Malpractice Reform Act (the Act) (L 1985, ch 294, eff July 1, 1985).

The Act institutes reform in several areas, including moderating attorneys' contingent fees, providing for periodic payments of large awards and penalizing frivolous claims. At issue in the instant action is the portion of the Act addressed to the problems of making excess insurance coverage available to practitioners and the cost thereof. Here, only a temporary statutory solution was achieved. Under sections 17 and 18 of the Act, malpractice insurance carriers are mandated to offer excess coverage of $1 million/$3 million to physicians and dentists having primary coverage in those amounts. Section 19 of the Act imposes the obligation on each general hospital in the State to purchase the foregoing excess insurance coverage on behalf of any physician or dentist having the requisite primary coverage who designates it as the hospital with whom the practitioner is primarily affiliated. The Act, however, only keeps sections 17 through 19 in effect for one year by specifically providing for their expiration on July 1, 1986 (§ 25).

Regarding reimbursement of hospitals for their payments of premiums for the excess insurance, plaintiffs and defendants agree that the legislative design was to pass on all or at least some of these costs to the State's principal third-party payors of hospital inpatient care charges, namely, Blue Cross, Medicaid and Medicare, through defendant State Commissioner of Health's rate-determination authority over general hospitals' charges to such third-party payors under Public Health Law article 28. The Act sets forth two separate sections for direct-

ing the Commissioner to implement this reimbursement plan, one (§ 20) for the first six months ending December 31, 1985, and a second (§ 21) for the remainder of the one-year life of the Act's provisions dealing with the procurement of and payment for excess insurance coverage. All parties concur that the separate provisions were necessitated by changes to take place on January 1, 1986 in rate-setting jurisdiction over charges to one of the principal payors, the Federal Medicare program. The Commissioner's authority to set Medicare rates will end December 31, 1985 and the setting of such rates thereafter will revert to the United States Department of Health and Human Services (HHS), due to the expiration on that date of a three-year (1983-1985) waiver by HHS which had ceded that authority to the Commissioner. A unique rate-setting methodology is provided under Public Health Law article 28 for that three-year period during which the Commissioner was to set Medicare rates, and the distinction is carried over into sections 20 and 21 of the Act. Thus, section 20 of the Act provides for such reimbursement by directing the Commissioner to make an "adjustment * * * to the inpatient revenue cap of such hospitals to reflect the cost of such excess coverage for the period of July first, nineteen hundred eighty-five to December thirty-first, nineteen hundred eighty-five". Undisputably, by the use of the statutory phrase of art "inpatient revenue cap", this section refers to a rate-setting system wherein the Commissioner controls hospital revenues from charges to all third-party payors, including Medicare (see, Public Health Law § 2807-a [1]). On the other hand, section 21 of the Act, governing reimbursement for the remaining six months of effectiveness of section 19 in 1986 during which the Commissioner will no longer have that authority, substitutes the phrase "established rate" for "inpatient revenue cap" in directing the Commissioner to make the same adjustment to reflect the hospitals' cost of providing excess coverage.

In August 1985, after approval of the Act, events occurred which prompted the commencement of this lawsuit. First, the State Department of Health advised plaintiff Hospital Association of New York State (HANYS) that the contribution from each third-party payor for such excess coverage would, in substance, be allocated according to previously determined ratios based on the respective utilization of inpatient hospital services by each payor's beneficiaries and subscribers and that there would be "no cross subsidization between payors". Then, the Regional Administrator for New York of the Health Care

Financing Administration of HHS advised HANYS that Medicare would not recognize the cost to hospitals of premiums for private physicians' malpractice insurance as an allowable expense. These two rulings would, in effect, require the general hospitals of the State to absorb without reimbursement the Medicare portion of their cost of obtaining the excess insurance coverage for the full year that section 19 of the Act is in effect. Plaintiffs estimate that the aggregate resultant losses would exceed $16 million.

The instant action was thereupon commenced, in which plaintiffs seek a judgment declaring the invalidity of section 19 of the Act as implemented by the Commissioner on the grounds that (1) sections 19 through 21 represent a unified statutory scheme combining the hospitals' obligation to procure the excess insurance coverage with the total pass-through of the cost thereof to third-party payors; therefore, if there is a failure to provide full reimbursement under sections 20 and 21, because of the Commissioner's refusal to provide full reimbursement, section 19's mandate to the hospitals regarding procurement of that coverage must also fail; and (2) without full reimbursement, section 19 unconstitutionally deprives plaintiffs of their property without just compensation and denies them due process and the equal protection of the laws. The case came before Special Term on an expedited motion by plaintiffs for summary judgment, plaintiffs having advised the court that the medical insurance carrier would only provide retroactive coverage to the July 1, 1985 effective date of the Act if policies were obtained before the first day of November 1985. Special Term promptly rendered a Bench decision denying plaintiffs' motion for summary judgment, construing sections 20 and 21 of the Act as mandating full reimbursement to the hospitals, but further holding that even if full reimbursement was not required under the Act, section 19 was not unconstitutional. This appeal then ensued, which we have also heard on an expedited basis in view of the November 1, 1985 deadline for procurement of insurance coverage retroactive to the effective date of the Act.

■ Preliminarily, we reject defendants' contention that the instant action is not ripe for declaratory relief because no final determination has been made by HHS on whether the insurance premium costs involved herein will be allowable as a legitimate Medicare expense between July 1, 1985 and December 31, 1985. The fact is that plaintiffs *presently* are obliged under the Act to incur the cost of obtaining excess

insurance coverage for the full year of July 1, 1985 to June 30, 1986. Defendants have refused to guarantee full reimbursement for the first six months of that year and have advised that they will do nothing to make up for the certain loss of Medicare-related reimbursement for the second six months. Plaintiffs' present options are thus to procure the excess coverage without any assurance of full reimbursement, or to refuse to do so at their peril. The issue clearly represents a present, actual controversy which furnishes the necessary justiciability for seeking declaratory relief (*see,* CPLR 3001; Siegel, NY Prac § 436, at 578).

Turning then, to the merits, as we shall explain below, statutory analysis and reference to the scant legislative history of sections 19 through 21 furnish no clear-cut resolution of whether full reimbursement is mandated under these provisions of the Act. This being the case, we have concluded that the determinative principle here is the necessity to avoid a construction of the statute under which grave doubts would exist as to its constitutionality. There is language in sections 20 and 21, and acknowledged background circumstances at the time of enactment, which sustain the position of each side to this controversy. In favor of full reimbursement, it is not seriously disputed that employment in section 20 of the phrase "adjustment * * * [of] the inpatient revenue cap * * * to reflect the cost of such excess coverage", was expected to effect full reimbursement of the insurance costs in question from third-party payors from July 1, 1985 to December 31, 1985. This would construe section 20 consistently with the portion of Public Health Law § 2807-a (6) (a) directing the fixing of hospital charges "sufficient to generate the inpatient revenue authorized by the revenue cap". The last quoted portion certainly implies that determining (or adjusting) the revenue cap not only serves to establish what may be considered as an allowable, albeit not necessarily fully recoverable, expense for rate-making purposes (as defendants would read both sections 20 and 21 of the Act), but also to establish the aggregate amount actually to be recovered by hospitals for such allowable costs. Regarding the statutory direction for the second half-year period of reimbursement, section 21 repeats verbatim the language of section 20 except for substitution of the phrase "established rate" for "inpatient revenue cap", which is to be adjusted to reflect the additional insurance costs. This single change in phraseology seems to accomplish nothing more than describing in another way the fixing of

hospital charges to payors for units of inpatient care. On its face, it is not inconsistent with a continued intent to provide for "dollar for dollar" reimbursement. Nor have defendants cited to any express provision within the entire hospital rate-setting scheme set forth in Public Health Law article 28, including its most recent amendment passed at the same session (L 1985, ch 807, eff Jan. 1, 1986), which would furnish any unequivocal indicator that the foregoing substituted phrase in section 21 requires a departure from the full recovery of the added insurance premium costs contemplated under section 20 for the earlier period. Moreover, we are unimpressed with defendants' argument for the opposite construction of the statute based upon the Legislature's rejection of HANYS' proposed amendment to make fully guaranteed reimbursement an express provision of the Act. The failure to pass an amendment is a dubious foundation for drawing inferences of legislative intent (*Clark v Cuomo,* 66 NY2d 185, 190-191).

Contrariwise, cogent bases also exist in support of defendants' position that sections 20 and 21 of the Act were not intended to mandate full reimbursement through cross-subsidization from other third-party payors for the short-fall attributable to the loss of Medicare charges for the subject insurance expenses. Present Public Health Law § 2807-a (renum 2808-c by L 1985, ch 807, eff Jan. 1, 1986), where "revenue cap" is defined and applied, expressly provides for apportionment of the revenue cap among the principal third-party payors on the basis of the comparative utilization of inpatient hospital services by the beneficiaries and subscribers of the payors (Public Health Law § 2807-a [1]). It is hardly unreasonable for the Commissioner to interpret the foregoing provision as a limitation on the liability of each third-party payor for reimbursement of the cost of inpatient care (including malpractice insurance) beyond its beneficiaries' or subscribers' proportionate utilization of such hospital services, and for him further to construe the revenue cap adjustment language in section 20 of the Act in parallel fashion. As to the operative phrase "established rate" in section 21 of the Act, to be applied after December 31, 1985, while the statute does not state it in so many words, it is readily inferable that the quoted phrase refers to the statutory methodology for establishment of rates by the Commissioner beginning January 1, 1986, as specifically provided for in a new section 2807-a (L 1985, ch 807, § 4, eff Jan. 1, 1986). That new section lists the

specific third-party payors whose hospital cost recovery rates are to be established by the Commissioner but, understandably, omits Medicare because of the expiration of the HHS waiver. Thus, it is certainly arguable that all that is to be accomplished by sections 20 and 21 of the Act is the adjustment, without cross-subsidization, of the respective portions of the revenue cap and of the established rate of each third-party payor according to its proportionate share of the utilization of services, and then only to the extent that the Commissioner has the legal authority to set rates as to each such payor.

As the foregoing analysis demonstrates at the very least, defendants' interpretation of sections 20 and 21 of the Act, as not requiring full reimbursement on the subject costs through cross-subsidization, cannot be said to be unreasonable or in direct conflict with the plain meaning of the statute. Ordinarily when dealing with the such technical statutory phrases as adjustment to the inpatient revenue cap and to the established rate, such construction of the statute by the agencies responsible for its administration should prevail (*Matter of Howard v Wyman,* 28 NY2d 434, 438). That principle would be applied here, but for our grave doubts as to the constitutionality of imposing the resultant financial loss upon general hospitals as taking of property without just compensation or a denial of substantive due process. Whether the Medicare portion of insurance cost recovery is in excess of $16 million as plaintiffs contend, or some lesser amount as estimated by defendants, there is no question that the losses would be substantial and would work serious hardships on some general hospitals in the State that are already in precarious financial circumstances. It is also undeniable that, whatever indirect benefits there may be to the hospitals as described by Special Term through assuring that practitioners will continue to function and admit patients to their facilities, the only direct beneficiaries of section 19 of the Act are private doctors and dentists who are neither the employees nor agents of the general hospitals and who are to be provided excess malpractice insurance covering activities which may have no connection whatsoever with inpatient hospital care. We may assume, as defendants maintain, that legislation to insure the free flow of medical services through relief from some of the defects in the malpractice liability system constitutes a valid exercise of the State's police power. This, however, does not end the constitutional inquiry. *Lutheran Church v City of New York* (35 NY2d 121, 128-132) teaches that regulation of private

property, even for the common good, may become so burdensome to its owner as to effectively destroy its productive value and thus constitute a naked taking without just compensation. Under defendants' construction of sections 19 through 21 of the Act, the general hospitals of the State will be deprived of several millions of dollars to provide the excess insurance coverage for private health practitioners without reimbursement. The appropriation of their property is absolute. The burden of the regulation on them is at least as extreme as in *Matter of Herkimer Pulp & Packaging Corp. v McMorran* (45 Misc 2d 127, *affd* 24 AD2d 929, *lv denied* 17 NY2d 423), wherein Justice (former Court of Appeals Judge) Foster held that a State regulatory agency's imposition upon a private landowner of the entire cost of flood control improvements upon its property (although clearly beneficial to the general public) constituted an appropriation rather than a valid regulation under the police power.

The validity of the Act as defendants construe it is equally at risk under substantive due process analysis. "The ultimate evil of a deprivation of property, or better, a frustration of property rights, under the guise of an exercise of the police power is that it forces the owner to assume the cost of providing a benefit to the public without recoupment" (*French Investing Co. v City of New York,* 39 NY2d 587, 596, *appeal dismissed* 429 US 990, *rearg denied* 40 NY2d 846). We are unpersuaded by defendants' argument that the hospitals will recoup their losses through increased Medicare revenue when regulation of charges under that program is restored to HHS at the end of 1985. Any such increase in income is at this point speculative (*see, French Investing Co. v City of New York, supra,* p 597). In any event, the hospitals' entitlement to the benefits from the change in Medicare funding regulation is in no way dependent upon or indeed even related in any way to their obligation to absorb the substantial losses in providing excess insurance coverage under the Act as interpreted by defendants. It is also noteworthy that defendants have not controverted plaintiffs' position that the Commissioner has legal authority to make the adjustments necessary to accomplish full reimbursement.

The lines of authorities cited by defendants in support of the opposite conclusion do not, in our view, alleviate the constitutional jeopardy in which the Act is placed by denial of full reimbursement. Regulation of space allotted to hospital beds, although impacting on hospital revenues (*see, Matter of*

*Engelsher v Jacobs,* 5 NY2d 370, *cert denied* 360 US 902), clearly falls within the valid end of the "gamut [of governmental interference with use of private property] from outright condemnation for which compensation is expressly provided to the regulation of the general use of land remaining in private ownership" (*Lutheran Church v City of New York, supra,* p 128). In such cases, no significant destruction of the productive value of the property has taken place (*see, Matter of Keystone Assoc. v Moerdler,* 19 NY2d 78, 88). Nor do we find applicable the cases cited by defendants upholding the imposition upon railroads of all or part of the costs of eliminating grade crossings (*see, Nashville, Chattanooga & St. Louis Ry. v Walters,* 294 US 405). Imposition of the grade crossing elimination burden upon the railroad requires a finding that the public safety requires the change (*Erie R. R. Co. v Public Util. Commrs.,* 254 US 394, 411-412 [Holmes, J.]). In such cases, it is the activity of the railroad which has created the dangerous condition; here, costs are imposed upon the hospitals in order to mitigate conditions caused by the activities of other private parties. On this score, it is instructive that the United States Supreme Court also has held that a railroad may not be validly charged if elimination of the grade crossing was impelled to benefit private adjoining landowners (*Chicago, St. Paul, Minneapolis & Omaha Ry. v Holmberg,* 282 US 162, 167 [Stone, J.]).

We need not finally dispose of the constitutional issue, however, in order to resolve the instant dispute. It is sufficient that the imposition upon general hospitals of these admittedly substantial costs involved in procuring insurance coverage for private practitioners *demonstrably* raises grave doubts concerning the constitutionality of the legislation. Under those circumstances and long-settled authority, we construe the ambiguities in the statute to avoid the risk of invalidation (McKinney's Cons Laws of NY, Book 1, Statutes § 150, p 321; *People v Nieves,* 36 NY2d 396, 400; *People v Pickett,* 19 NY2d 170, 176-177; *Matter of Coates,* 9 NY2d 242, 253, *appeal dismissed sub nom. Coates v Walters,* 368 US 34). Accordingly, despite the absence of a demand on plaintiffs' part for such relief in their declaratory judgment complaint, we exercise our " 'power to declare the rights and legal relations of the parties whatever they may be' " (*Cahill v Regan,* 5 NY2d 292, 298, quoting *Rockland Light & Power Co. v City of New York,* 289 NY 45, 51) and declare that the proper construction of sections 20 and 21 of the Act requires full reimbursement to

general hospitals of the costs of providing excess insurance coverage to physicians and dentists. As so construed, the Act withstands all of the constitutional challenges raised in plaintiffs' complaint. Although full reimbursement through cross-subsidization is not without its imperfections, as a partial, temporary solution to the medical malpractice crisis, it has the effect, consistent with the underlying statutory purpose, of more widely distributing the cost burden thereof among the ultimate consumers of health services in the State.

WEISS, J. (concurring). While I am in total agreement with the declaration of plaintiffs' rights made by the majority in this case, I concur separately due to the difference in legal reasoning which leads me to the conclusion that plaintiffs are entitled to full reimbursement for the cost of providing excess insurance coverage to physicians and dentists. It is my view that plaintiffs' entitlement to this relief is mandated by the clear and unambiguous language of the Medical Malpractice Reform Act (the Act) without resort to any analysis of the various constitutional arguments advanced by plaintiffs.

The relevant provisions of the Act (§§ 20, 21) direct that the State Commissioner of Health "shall adjust" the applicable payment rates to hospitals and that the adjustment "shall be made * * * to reflect the cost of such excess coverage". Use of this language indicates to me the Legislature's desire to ensure that those hospitals required to provide the excess insurance coverage be fully reimbursed for the total cost thereof. To adopt defendants' contention that sections 20 and 21 of the Act were meant to exclude from the payment rate adjustment that portion of the excess insurance cost attributable to Medicare patients would be to ignore the plain and ordinary meaning of the words used. Such a conclusion would require judicial legislation rather than judicial interpretation. I therefore see no other way to read the language of sections 20 and 21 requiring the Commissioner to adjust hospital payment rates to reflect the excess insurance costs except to say that full reimbursement for the entire cost was intended by the Legislature.

KANE, J. P., YESAWICH, JR., and HARVEY, JJ., concur with LEVINE, J.; WEISS, J., concurs in a separate opinion.

Order modified, on the law, without costs, by declaring that section 19 of the Medical Malpractice Reform Act is not void and unenforceable because sections 20 and 21 thereof mandate

that the hospitals be fully reimbursed for the cost of providing excess insurance coverage to physicians and dentists, and, as so modified, affirmed.