**STATE OF NEW YORK, by its Commissioner of Social Services, Cesar A. PERALES, Petitioner,**

v.

**Louis R. SULLIVAN, M.D.,* Secretary of the United States Department of Health and Human Services, and the United States Department of Health and Human Services, Health Care Financing Administration, Respondents.**

No. 1110, Docket 89–4004.

United States Court of Appeals,
Second Circuit.

Argued May 11, 1989.

Decided Jan. 5, 1990.

---

* During the pendency of this appeal Otis R. Bowen, M.D., then Secretary of the United States Department of Health and Human Services ceased to hold that office, and Louis R. Sullivan, M.D. succeeded him. *See* Fed.R.App.P. 43(c)(1).

Laurel W. Eisner, Asst. Atty. Gen. of the State of N.Y., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Judith T. Kramer, Asst. Atty. Gen. of the State of N.Y., New York City, of counsel), for petitioner.

Elizabeth Dusaniwskyj, Asst. Regional Counsel, U.S. Dept. of Health and Human Services, New York City (Annette H. Blum, Chief Counsel, U.S. Dept. of Health and Human Services, New York City, of counsel), for respondents.

Before KEARSE, CARDAMONE and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

The sole legal question involved in this appeal is whether New York hospitals may include in their reimbursement rates under the Medicaid Act, 42 U.S.C.A. §§ 1396–1396s (West 1983 & Supp.1989), some of the costs incurred in obtaining excess medi-cal malpractice insurance for attending physicians. In attempting to delve into the vast, cumbrous array of the Medicaid statute and its regulations, the relevance of Bacon's observation that in humans generally there is "more of the fool than the wise" becomes apparent. F. Bacon, *Essays, of Boldness*, 3 Harv. Classics 33 (Eliot ed. 1909). Fortunately, the issue presented is narrowly focused and the correct answer to the question raised may be gleaned by careful analysis.

New York State, by its Commissioner of Social Services, Cesar A. Perales, petitions for review of a decision of the Secretary of the United States Department of Health & Human Services (Secretary) which affirmed a decision of the United States Health Care Financing Administration (Health Administration or Administration) disapproving New York State Medicaid Plan Amendments 86–6, 86–23, 87–34, and 87–10A (Amendments). The Health Administration's decision was affirmed by the Secretary in a decision dated November 15, 1988. The proposed amendments would revise the method for calculating payment rates for inpatient hospital services to include in the reimbursement rate part of the costs of providing excess medical malpractice insurance coverage for attending physicians who provide emergency care in the hospital. Because the Secretary's ruling is neither arbitrary nor capricious, and is within the scope of his statutory authority based upon a permissible interpretation of the Medicaid statute, we affirm.

## BACKGROUND

Title XIX of the Social Security Act, 42 U.S.C.A. § 1396 *et seq.* (West 1983 & Supp. 1989) (Medicaid Act or the Act), establishes a cooperative federal/state program that reimburses health care providers for the costs incurred when treating low income and disabled patients who are unable to pay for health care. A state is not required to participate in the Medicaid program, but if it does it must comply with the Act and its implementing regulations. A state satisfying federal requirements is thereby entitled to reimbursement for a

portion of the costs incurred in providing medical assistance to qualified recipients.

To qualify for federal financial participation under the Act, a state must develop and submit to the Secretary—through the Financing Administration—a Medicaid "plan" describing its medical assistance program. The plan must indicate the types of care the state's program will cover, and must include certain services specifically required by the Act, such as inpatient and outpatient hospital services, and laboratory, X-ray, skilled nursing, and physicians' services. 42 U.S.C. §§ 1396a(a)(10)(A) and 1396d(a)(1)–(5).

The state plan must also establish a rate at which it will reimburse health care providers for each service under the plan, and must provide

> for payment ... of the hospital, skilled nursing facility, and intermediate care facility services provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs ...[)] which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access ... to inpatient hospital services of adequate quality....

42 U.S.C. § 1396a(a)(13)(A).

We have previously held that § 1396a(a)(13)(A) has been properly interpreted by the Secretary to apply only to inpatient hospital costs. *See State of New York v. Bowen*, 811 F.2d 776 (2d Cir.1987). This appeal asks what kind of hospital expenses may properly be included as inpatient hospital costs.

To answer that question we must analyze the two types of relationships that exist between doctors and the hospitals where their medical services are rendered; one type is staff physicians, the other is attending physicians. The former are salaried employees of a hospital; the latter are not employees of the hospital, but are in private practice for themselves, usually maintaining offices outside the hospital. Doctors denominated as staff physicians are usually recent graduates of medical schools who are completing a residency program, administrators who run the hospital's medical facilities, and senior staff physicians who supervise and train junior staff physicians and oversee the various medical departments. As salaried employees, medical malpractice insurance for staff physicians is almost always paid for by the hospital. The hospital includes this cost as an inpatient service cost for which it is reimbursed under § 1396a(a)(13)(A) of the Act.

Attending physicians need to be affiliated with a hospital in order to admit their patients to the hospital. These doctors often perform services for individuals who are not their patients, but who were admitted directly to the hospital for emergency services. Obviously, they too provide valuable and necessary medical services for the hospital. Such physicians usually pay for their own primary malpractice insurance, which covers them for all their activities, whether performed inside or outside the hospital.

In 1985, the New York State Legislature passed the Medical Malpractice Reform Act, 1985 N.Y.Laws ch. 294, *amended*, 1986 N.Y.Laws ch. 266 (Malpractice Act), in response to the malpractice crisis. Due to the rising cost of obtaining malpractice insurance coverage and limitations on their primary coverage, many attending physicians—especially those in high-risk specialties—felt compelled to curtail their in-hospital practices. Because in-hospital care of the hospital's patients (as distinct from their own) exposed them to greater malpractice liability with resultant higher insurance premiums, a number of doctors either curtailed or ceased providing services for hospital patients. As a result there

were not enough attending physicians available to deliver some high-risk services that the hospitals ordinarily provided.

The Malpractice Act was enacted to "ensure the continued availability and affordability of quality health services in New York state." 1985 N.Y.Laws ch. 294, § 1. It instituted many reforms in the medical malpractice field. One of its provisions mandates that hospitals purchase excess malpractice liability insurance for attending physicians who declare their primary affiliation with that hospital. 1985 N.Y. Laws ch. 294, § 19. The Malpractice Act states that physicians given excess insurance coverage by a hospital must furnish their own primary malpractice insurance in an amount not lower than $1 million per claimant and $3 million for all claimants. The excess coverage must bring the total coverage up to $2 million per claimant and $6 million aggregate, *id.*, and applies to malpractice awards arising from both inpatient hospital and office-based care.

Under the Malpractice Act, the cost to the hospitals of the premiums for the excess malpractice insurance will be included in the *per diem* hospital rate along with the other costs of doing business. *Id.* at § 21. It is this rate that is used to determine what the hospital's reimbursement will be from medical care cost providers, such as Blue Cross, Medicaid, and other third-party payors. The rate covers all reimbursable operating costs, including, for example, wages, fringe benefits and medical malpractice insurance for staff physicians, overhead, and capital expenses.

After the Malpractice Act was passed, New York submitted to the HCFA the proposed amendments to its state Medicaid plan, that are the subject of this litigation, seeking the HCFA's approval of the inclusion of a portion of the excess insurance premiums under the Medicaid Act. New York indicated that 5.2 percent of the total premium costs of the hospital-provided excess insurance was an inpatient hospital cost subject to reimbursement under § 1396a(a)(13)(A). This percentage was arrived at through a statistical analysis of the percentage of those claims paid on be-

half of each major category of third-party payor in every New York hospital from 1981 through 1984. The costs for the excess insurance were allocated among all the payors based upon the percentage of claims paid on behalf of each payor.

The portion of the excess premiums found allocable to Medicaid was approximately 17.4 percent, which included a proportionate share of the amount of excess insurance costs allocated to Medicare through the state's statistical analysis. The Medicare portion of the hospital's cost of the excess insurance was allocated proportionately among all the other payors, including Medicaid, because the Secretary made a preliminary determination that excess insurance costs would not be reimbursable by Medicare—a uniform nationwide system as opposed to the state-based system of Medicaid. Because the excess insurance covers doctors' office-based as well as inpatient hospital services, the state plan included only 60 percent of the total Medicaid share of the costs, or 10.3 percent of the total cost of the excess coverage (representing 60 percent of the approximately 17.4 percent allocated to Medicaid).

Sixty percent was not arbitrarily selected; it reflected the proportion of malpractice claims made by Medicaid patients against physicians arising from inpatient hospital incidents that had been paid. Of the 10.3 percent, 50 percent was to be paid by the state and 50 percent by federal matching funds, arriving therefore at the 5.2 percent figure used by New York. Hence, the percentage of the excess insurance costs included in the proposed plan amendments was determined through application of two statistical studies that attempted to limit Medicaid's share of the excess insurance costs to that portion of the costs which could be characterized as covering the attending physicians' treatment of Medicaid patients in a hospital. The Health Administration and ultimately the Secretary refused to adopt the state's proposal and disapproved the suggested amendments to the state's Medicaid plan. This petition for review followed.

## DISCUSSION

### I  Scope of Review

We must determine whether the Secretary's rejection of New York's proposed amendments was arbitrary or capricious or otherwise contrary to the purpose of the Medicaid statute. Because this review is of an administrative determination made by the Secretary, entrusted under the statute with administering Medicaid, substantial deference is accorded his view. *See Connecticut Dept. of Income Maintenance v. Heckler*, 471 U.S. 524, 532, 105 S.Ct. 2210, 2214–15, 85 L.Ed.2d 577 (1985). Deference is especially appropriate when reviewing an executive agency's interpretation of a statute as unwieldy as the Medicaid Act. *State of New York v. Bowen*, 811 F.2d at 778.

The agency's interpretation is followed unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). Critical in this case is the recognized rule that where the language of the statute allows for more than one reasonable construction, a court may not substitute its interpretation of the statute for that of the agency charged with administering it. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). New York asserts on a number of grounds that the Secretary's decision fails to satisfy even this highly deferential standard. We address each ground separately.

### II  Who Determines What Costs Are Reimbursable

New York's first argument is that the Medicaid statute authorizes the states, rather than the Secretary, to determine the reasonable and necessary costs of providing adequate hospital care. Conceding that § 1396a(a)(13)(A) applies only to inpatient hospital costs, it points out that the statute gives no further definition of what constitutes such costs. The plain language of the Act, the state continues, grants to *the states* the authority to determine which costs are necessary to achieve the statutory goals of maintaining "efficiently and economically operated facilities" that will provide care that conforms with "State and Federal laws, regulations, and quality and safety standards," and assure that Medicaid eligible persons will "have reasonable access ... to inpatient hospital services of adequate quality." § 1396a(a)(13)(A)

This argument presupposes that Congress envisioned the states as having broad discretion to determine what should be included as an inpatient hospital cost. It relies on language in § 1396a(a)(13)(A) indicating that state plans must provide for payment of the hospital "through the use of rates (determined in accordance with methods and standards developed *by the State* ...[)] which *the State finds*, and makes assurances satisfactory to the Secretary, are reasonable and adequate...." *Id.* (emphasis added).

If the language of a statute is clear and unambiguous, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82. No doubt the language of § 1396a(a)(13)(A) evinces Congress' plan to grant the states latitude in setting its Medicaid rates—"rates ... which the State finds ... are reasonable and adequate." Yet, the Act may not be read to reduce the Secretary's review of rates fixed by the states to a *pro forma* procedure that will nearly always result in his automatic imprimatur. Instead, the state is required to "make[] assurances satisfactory to the Secretary" that its rates are reasonable and adequate. And, the legislative history of this provision indicates that Congress expected the state's assurances to be considered satisfactory absent "a formal finding to the contrary by the Secretary." S.Rep. No. 139, 97th Cong., 1st Sess. 478, *reprinted in* 1981 U.S.Code Cong. & Admin.News 396, 744. Here, the Secretary has made a "formal" finding that the inclusion of a portion of the costs of the excess insurance in inpatient hospital rates is unreasonable.

In *State of New York v. Bowen,* we ruled that in a dispute between the Secretary and a state over the scope of what may properly be included in the rates set by the state under § 1396a(a)(13)(A), the Secretary could reject an item included by the state that he determined was not an inpatient hospital cost. 811 F.2d at 779. Further, the Secretary's decision to exclude certain costs from the inpatient hospital rate is entitled to substantial deference. *Id.* at 778. Thus, in construing the Medicaid Act the Secretary's determination to eliminate a cost from the inpatient hospital rate—such as the cost of excess malpractice insurance—must be upheld absent a finding that it was arbitrary and capricious or in conflict with the provisions of the Act. The ultimate determination of what costs are reimbursable under the Medicaid Act therefore rests on the Secretary.

### III  *Medicare Principles Versus Medicaid Principles*

New York next attempts to demonstrate that the Secretary's decision was contrary to Congress' intent to separate the Medicare and Medicaid statutes and prevent the Secretary from setting Medicaid rates according to Medicare principles. It urges that the Secretary relied on the definition of "inpatient hospital services" found in the Medicare statute because there was no such definition in the Medicaid Act, *compare* 42 U.S.C. § 1395x(b) (Medicare) *with* 42 U.S.C. § 1396d (Medicaid), and that this amounts to application of Medicare principles to Medicaid rate-setting. In support of this argument, New York refers to the legislative history of revisions of the Medicaid Act (including the 1981 revision of § 1396a) indicating that Congress intended to separate Medicare and Medicaid cost principles. *Compare* 42 U.S.C. § 1396a(a)(13)(D) (repealed 1981) *with* 42 U.S.C. § 1396a(a)(13)(A); *see also* H.Rep. No. 391(I), 100th Cong., 1st Sess. 528–29, *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313-1, 2313–348–49; H.Rep. No. 727, 99th Cong., 2d Sess. 121–22, *reprinted in* 1986 U.S.Code Cong. & Admin. News 3607, 3711–12; S.Rep. No. 139, 97th Cong., 1st Sess. 478, *reprinted in* 1981 U.S.Code Cong. & Admin.News 396, 744–45.

We need not address the question of whether Congress insulated Medicaid rate-setting decisions from the application of Medicare principles involving similar services. Assuming, *arguendo,* that Congress had in mind such a complete segregation in statutory interpretation, nothing in the Secretary's decision excluding the costs of the excess malpractice insurance suggests that it was based solely upon Medicare principles.

The Secretary looked first to other sections of the *Medicaid* Act. In one of the definitional sections, "inpatient hospital services" and "physicians' services" are listed separately. *See* 42 U.S.C. §§ 1396d(a)(1) and 1396d(a)(5). Physicians' services are defined to include "services furnished by a physician … whether furnished in the office, the patient's home, a hospital, or a skilled nursing facility, or elsewhere." § 1396d(a)(5). In reviewing the state's proposal to include the costs of the excess insurance within the inpatient hospital rate, the Secretary concluded that this cost is more properly characterized as a cost of physicians' services. It was the Secretary's view therefore that this cost should be claimed under a separate provision of the Act that provides reimbursement for costs other than inpatient hospital services costs. *See* 42 U.S.C. § 1396a(a)(30).

Although the Secretary refers to the Medicare Act in his decision, that Act is looked at only to give further guidance in defining the term "inpatient hospital services." We do not think this reference may fairly be characterized as an application of Medicare cost principles to the Medicaid Act. The administrative determination was supported by the provision in the Medicaid Act defining physicians' services, and further supported by the administrative finding that the primary beneficiaries of the proposed additional insurance costs are the physicians themselves. Consequently, the Secretary's decision was founded primarily upon considerations other than the Medi-

care statute's definition of inpatient hospital services and did not contravene Congress' aim to separate the two statutes.

## IV  Inpatient Services Versus Physicians' Services

As just recited, the Secretary's rejection of the state's proposed amendments was based upon his finding that the costs of the excess insurance were more properly categorized as costs for physicians' services than as costs for inpatient hospital services. In reaching this conclusion, the Secretary drew support from *Hospital Association v. Axelrod*, 113 A.D.2d 9, 494 N.Y.S.2d 905 (3d Dep't 1985). There, an association of hospitals sued New York's Department of Health arguing that the excess insurance requirement amounted to an unconstitutional taking of property without just compensation because it did *not* benefit the hospitals. The state court ultimately upheld the validity of the Malpractice Act, finding that it required third-party payors (such as Medicaid and Blue Cross) to reimburse hospitals for the cost of providing the insurance. Significantly, the state court also found that it was the private doctors and dentists not employed by the hospitals—rather than the hospitals—who were the direct beneficiaries of the excess insurance that will cover "activities which may have no connection whatsoever with inpatient hospital care." *Id.* at 15, 494 N.Y.S.2d 905.

To all of this, the state responds that the Secretary ignores the interrelationship between attending physicians' services and the excess insurance provided them to resolve the medical malpractice crisis that threatened the viability of New York's hospitals. Providing doctors with excess liability insurance benefitted the hospitals primarily, the state asserts, by inducing attending physicians to continue to deliver medical services to the hospitals. The state argues that without providing malpractice insurance, hospitals could not attract sufficient attending physicians to assure adequate health care for their patients.

Concededly, the state correctly urges that the excess insurance helped the hospitals, and may even have saved a number of them from going out of business. Yet the question is not whether the hospitals have received a definite and substantial benefit—which they have—but whether the *primary* beneficiaries of the insurance are the doctors or the hospitals. Although the hospitals now have more attending physicians, this is an indirect benefit of the insurance program; the payment of excess insurance premiums does not insure the hospitals any increase in physicians' services. The insurance is available to any doctor who requests it so long as he or she admits at least one patient a year to the hospital with which the doctor claims primary affiliation. Because the excess insurance covers all treatment—rendered both outside and inside the hospital—one could readily suppose that there might be a strong incentive for a doctor to maintain only the minimum contact necessary to obtain the extra insurance coverage. Thus, there is no guarantee that the hospitals will continue to be even an indirect beneficiary.

Although hospitals may presently benefit indirectly from a program that provides direct benefits to physicians, the costs for such a program may not be characterized as inpatient hospital costs. Other measures were enacted by the New York Legislature to mitigate the medical malpractice crisis. These included, for example, reform of malpractice litigation and awards, and medical misconduct disciplinary actions. *See* 1986 N.Y.Laws Ch. 266. These improvements probably benefited the hospitals—as did their payment of excess insurance premiums—by reducing the risks and costs of medical malpractice on doctors' in-hospital practices. Yet, it is plain that the costs of administering these measures could not and were not sought to be included in the inpatient hospital services rate.

## V  Apportionment of Costs Through Statistical Analyses

Finally, the state tries to demonstrate a direct connection between the benefits that inure to the hospitals and the costs of the excess insurance by using the two earlier

described statistical analyses to apportion Medicaid's share of the costs. These analyses are actually an attempt to separate that part of the excess insurance that accrues entirely to the benefit of the physicians from that part which benefits the hospitals. This separation forms the basis of the state's argument that the costs of the excess insurance can be characterized as inpatient hospital costs. Through such apportionment the state has attempted to distill for reimbursement only those costs that can be attributed directly to the services provided in a hospital for Medicaid eligible patients.

Perhaps these sorts of analyses are accurate statistically, but their computation and application in this case represent a sharp departure from previously accepted methods of inpatient hospital services rate-fixing. The state uses its statistical formulas to compensate for the lack of any requirement that, in order to qualify for the increased insurance coverage, a physician perform any inpatient hospital service or provide care to any Medicaid eligible person. Thus, there is no assurance that these actuarial formulas will continue to reflect accurately the extent to which the excess insurance indirectly benefits the hospitals. In fact, the provision of excess insurance could effect a significant change in the rate of inpatient hospital care provided by attending physicians because it gives them a "minimum incentive" to admit only a few token patients a year in order to receive the benefit of excess insurance.

Had the state chosen to tailor the provision of excess insurance more closely to the provision of inpatient hospital services (for example, by providing attending physicians excess coverage for only those services performed inside the hospital), it would perhaps have a stronger case. Because it chose to provide comprehensive coverage for physicians, it cannot now attempt to apportion the costs of that coverage to recover federal reimbursement for the portion which it can indirectly link to the inducement of inpatient hospital services by attending physicians.

Allowing New York to do so would expand the borders of inpatient hospital costs outward and could lead to the inclusion of other external costs that the state may argue are incurred to induce a greater number of attending physicians to provide inpatient hospital services. These might include, for instance, the costs of medical student financial assistance, medical school grants and, as noted above, the costs of administering the other reforms enacted by the Malpractice Act. Although the costs that the state has attempted to include in the instant case might be more closely related to inpatient hospital care than some of those just recited, the Secretary's decision to draw the line excluding them from inpatient hospital costs cannot be said to be arbitrary or capricious.

Thus, the state's contention that the excess malpractice insurance benefitted the hospitals and was in fact enacted for their benefit fails to establish that the costs of the insurance may be classified properly as an inpatient hospital service cost. Consequently, the state's assertion that the hospitals have been aided by the inducement of continued services of attending physicians caused by the excess insurance is not sufficient to make arbitrary the Secretary's conclusion that the insurance should not be included as an inpatient hospital cost.

## CONCLUSION

The Secretary's decision to exclude the prorated costs of excess medical malpractice insurance for attending physicians from § 1396a(a)(13)(A)'s inpatient hospital service category was within his authority and neither arbitrary nor capricious. Even though the state has offered reasonable arguments for inclusion of these costs, the decision necessarily comes down to drawing a line. Beyond this line, the benefits to a hospital of a given measure are linked too indirectly to the measure itself to allow its costs to be included as an inpatient hospital service. The Secretary's decision to draw that line to exclude the excess insurance costs was reasonable considering the large variance that the state's Malpractice Act allowed between hospital services actually

provided by a physician and the entitlement to excess insurance coverage.

Accordingly, the order appealed from, disapproving New York State Medical Plan Amendments 86–6, 86–23, 87–34, and 87–10A, is affirmed.