**PHOENIX MUTUAL LIFE INSURANCE COMPANY, Plaintiff,**

v.

**INSURANCE DEPARTMENT OF the STATE OF NEW YORK, and Albert B. Lewis, as Superintendent of Insurance of the State of New York, Defendants.**

No. 80 Civ. 1051 (JMC).

United States District Court,
S. D. New York.

March 31, 1980.

LeBoeuf, Lamb, Leiby & MacRae, New York City (Taylor R. Briggs, Howard S. Ockman and Eric A. Savage, New York City, of counsel), for plaintiff.

Robert Abrams, Atty. Gen. of the State of New York, New York City (Robert S. Hammer, Asst. Atty. Gen., of counsel), for defendants.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Motion for a preliminary injunction, enjoining the defendant during the pendency of this action from enforcing Section 219.-4(h) of Regulation 34A of the Insurance Department of the State of New York, 11 N.Y.C.R.R. § 219.4(h), against the plaintiff, is granted. Fed.R.Civ.P. 65(a).

By Order to Show Cause issued on February 22, 1980, (Haight, D. J.), plaintiff brought on the instant application for preliminary relief. Judge Haight entered a temporary restraining order enjoining enforcement of the disputed regulation pending a hearing on the preliminary injunction before Judge Stewart. Thereafter, the parties agreed to extend the restraining order and adjourn the hearing so that it could be heard by this Court, to which the case has been assigned for all purposes.

A hearing was held on March 18, 1980, and both sides were heard. The only evidence presented was introduced in their respective papers by way of affidavit. At the conclusion of the hearing, the Court reserved decision and extended the temporary restraining order pending its decision.

## FACTS

The facts are largely undisputed. On January 11, 1980, the defendant Insurance Department of the State of New York ["the Department"] promulgated the following proposed regulation:

The use of the phrase "low cost" or a similar term shall not be used [*sic*] to categorize a company's operations or poli-

cy portfolio. A particular policy form may be referred to as being "low cost" only when this is capable of being demonstrated to the satisfaction of the Superintendent. Companies using the phrase "low cost" in their advertisements must be prepared to demonstrate such "low cost" to any consumer requesting substantiation.

11 N.Y.C.R.R. § 219.4(h) [hereinafter referred to as "section 4(h)"].

Phoenix Mutual Life Insurance Company ["Phoenix"], the plaintiff herein, appeared at a hearing before the Department on February 1, 1980, to testify in opposition to the proposed regulation. The President of Phoenix stated that the company supported prohibiting the phrase "low cost" where its truth could not be proven, but argued that a blanket ban is unnecessary to accomplish that. He invited the Department to establish "benchmarks" to which the cost of a company's policies and operations could be compared. Despite the opposition of Phoenix and other insurers,[1] however, the Department adopted section 4(h). Phoenix thereafter commenced the instant action seeking preliminary and permanent injunctive relief against enforcement of the regulation.

Phoenix contends that section 4(h) strikes at the heart of its advertising campaign. For at least five years, it has stressed "its reputation for low cost whole life insurance."[2] One of its printed advertisements published in 1975, contains a table listing allegedly comparable ordinary life insurance policies offered by fifteen different companies, and ranking them by cost as calculated by the "Interest-Adjusted Cost Index" method, which is described *infra*. After a rather lengthy explanation of the table, the ad concludes: "Low cost is no longer our goal . . . *it is our achievement*. If low cost is important to you, call Phoenix Mutual today."[3]

All of Phoenix's subsequent advertisements contain a similar message, as well as the following phrase, which appears to have become the company's motto: "We're saving a lot of people a lot of money." A typical example is one published in 1978, which contains a photograph of Virginia Knauer, former Special Assistant to the President for Consumer Affairs, and a statement attributed to her extolling the low cost of the whole life policies offered by Phoenix. The full text of this ad is reprinted in the margin.[4]

1. The plaintiff contends, and has offered to substantiate, that a representative of the New York State Association of Life Underwriters, "suggested that representations of low cost be permitted when presented together with the basis for the representation, the comparison group, the cost measure used and the non-guaranteed or variable nature of dividends." Plaintiff's Memorandum of Law at 4 n.* (filed Feb. 22, 1980). A similar position was taken by the Teachers Insurance and Annuity Association and College Retirement Equities Fund. *Id.* Also, Northwestern Mutual Life Insurance Company proposed amending the regulation to include the phrase "unless such can be proven." *Id.*

2. *See* Affidavit In Support of Application For Order to Show Cause, Exhibit 2 (filed Feb. 22, 1980).

3. *See id.*, Exhibit 2, at 4.

4. "I'm a consumerist and I assure you, Phoenix Mutual deserves its reputation for low cost whole life insurance."
   Virginia Knauer, former
   Special Assistant to the

President for Consumer Affairs.
   "Costs for identical life insurance protection can vary widely from one company to another."
   "Consumers should shop around and compare the costs of competing whole life insurance plans. You should carefully choose the plan tailored to future needs and security for your family."
   "If you are a two-income family you need *extra* whole life insurance to protect your lifestyle if one partner dies."
   "Both of you should be involved in the decision. The wise woman will be willing to suggest some sacrifices and will encourage her husband to purchase adequate coverage. The sacrifice you make today will provide you with a more secure future. But buy that protection for tomorrow at the *lowest* possible cost."
   "Shop wisely and compare. Compare competitive plans. You'll find, as I did, that Phoenix is a leader in the field for low cost. With 125 years of experience, Phoenix Mutual has learned how to serve the consumer well."
*The Phoenix Mutual Philosophy.*

Phoenix believes that its advertising campaign stressing low cost has been and will continue to be crucial to its success. It cites a 1978 survey of consumer attitudes showing cost to be the second-most important factor to the buying public, topped only by the readability of the policy.[5] In addition, Phoenix contends that between 1971 and 1977, it nearly tripled its share of the New York market, a result it attributes to its advertising emphasis on cost.[6] The defendant does not dispute this.

From the evidence submitted to the Court, it appears that "Interest-Adjusted Indexes" are a generally accepted method of comparing life insurance costs. A 94-page booklet published by the defendant in 1977, entitled *Consumers Shopping Guide For Life Insurance*, states: "[A]lthough there is no single cost comparison system that will answer all the questions for a consumer shopping for life insurance, the most widely accepted method is comparing interest-adjusted indexes."[7] As the *Guide*

explains, comparing the premiums of different policies would be misleading, since "participating" policies[8] generally pay dividends, which represent a share of the excess of the company's income over expenses and reserves. Thus, a more accurate estimate of cost would be the premiums minus any expected dividends. Even this would be misleading, however, since premiums and dividends are paid out over time, and therefore their value depends upon an interest rate.[9]

An "Interest-Adjusted Payment Index," which can be calculated for any policy, and which is usually expressed as a rate per $1,000 of insurance, takes into account the value of money over time, and is therefore a better basis for comparison. It is the fixed amount that would have to be paid annually over a particular period and at a particular interest rate, in order for the series of such payments to have a present value equal to the present value of the

> We paid Virginia Knauer to give us her consumer point of view on the subject of whole life insurance. Unquestionably Phoenix Mutual meets her criteria for a consumer-oriented company. A company that gives the consumer the opportunity to buy the most whole life insurance at the lowest possible cost. A primary corporate goal of Phoenix Mutual.¹
>
> \* At the ages most insurance is purchased . . . and based on the most widely used method of comparing long-range costs of various policies bought today . . time and time again Phoenix Mutual is shown to have lower costs than those of competing companies. And they have independent third party figures to support that statement.
>
> Phoenix Mutual also believes in providing good advice on planning before and after purchase. So you can be sure you're getting the best protection for your money.
>
> It's a strong people philosophy. It's a strong business philosophy.
>
> A philosophy that's made this 125-year-old company one of the most respected insurance companies in America.
> PHOENIX MUTUAL
> Hartford, Conn. 06115
> We're saving a lot of people a lot of money.

5. *See* Affidavit of Dennis F. Hardcastle at 3 (filed Feb. 22, 1980).

6. *See id.* at 4.

7. N.Y. Insurance Dep't, Consumers Shopping Guide For Life Insurance 24 (1977) [appended

as Exhibit B to Affidavit of Alvin H. Alpert, Chief of the Life Insurance and Companies Bureau of the New York State Insurance Department (filed March 18, 1980); hereinafter cited as "*Guide*"].

8. The many types of life insurance—term, whole life, limited payment life, etc.—may also be classified as either participating or non-participating. A policy providing for payment of dividends is known as participating; the non-participating type pays no dividends.

. . . Dividends come from any excess investment earnings plus that portion of your premium payments that are [*sic*] left after the company pays the current year's benefits to policyholders, pays the expenses of operation, and puts aside reserves for future benefit payments. . . .

The primary advantages of the non-participating policy are its fixed cost and generally lower out-of-pocket premium; participating policies, on the other hand, enable you to benefit from any favorable experience of your company so that overall long-term costs may be less than those for non-participating policies.

*Guide*, *supra* note 7, at 11.

9. It must be conceded that the interest rate used in the *Guide*, 5%, is somewhat unrealistic at the present time.

series of premium payments minus expected dividends for a particular policy over the same period and at the same interest rate. Even this index does not provide a complete description, however. One other factor still remains to be considered, namely, the surrender value of whole life policies.

Because whole life policies usually provide for a fixed premium throughout the life of the insured, the premium is set at a rate higher than necessary to cover the mortality risk at early ages, but lower than would otherwise be required at later ages. This enables the company to build up a reserve to cover the increased later mortality, and allows the insured to avoid the prospect of accelerating premium costs. As a consequence, a whole life policy should ordinarily have a cash surrender value related to the amount held in reserve. This surrender value, amortized at a chosen interest rate, should therefore also be included in a cost comparison. This is precisely what the "Interest-Adjusted Cost Index" does.

Defendant's *Guide* contains tables which present cost information about participating whole life policies offered by sixty-three different companies.[10] These tables are categorized according to three variables: sex; face amount of policy (only two sample face amounts are presented, $10,000 and $25,000); and age (three sample ages—20, 35, and 50—are provided). Thus, for each company, twelve sample participating whole life policies are compared.[11] Among the data provided for each policy are cost and payment indexes computed on both a ten-year and a twenty-year basis.

From the data provided in the *Guide*, the Court has compiled a table (*see* Appendix A) which compares the cost and payment indexes of the policies offered by the plaintiff, with the mean and lowest indexes for each of the twelve sample participating whole life policies included in the *Guide*. As can readily be seen, in only one instance is the index for Phoenix higher than the mean index: for a $25,000 policy on a 20-year old female, the ten-year payment index for the Phoenix policy is 10.99, whereas the mean is 10.98; even so, the ten-year cost index for that policy is 3.04, well below the mean of 4.14. For all other policies compared in the *Guide*, the interest-adjusted payment indexes for Phoenix's policies are below the mean, and the interest-adjusted cost indexes are well below the mean. Furthermore, Phoenix offers special policies to non-smokers, the cost indexes of which are generally even lower than for Phoenix's regular policies.[12]

Several words of caution are in order about comparisons derived from the tables in defendant's *Guide*. Fourteen of the sixty-three listed companies base their rates on the insured's age at the last birthday, whereas Phoenix and forty-eight others use age at nearest birthday. This difference probably benefits Phoenix and similar companies, making their indexes slightly lower than they would be if they used age at last birthday. On the other hand, the tables in the *Guide* are to some degree misleading in a way that is unfair to Phoenix, since they include among the sixty-three companies two that do not sell to the general public.[13]

10. The *Guide* also contains comparative cost data for non-participating and term policies. Since plaintiff's advertising claims are directed only to participating whole life policies, however, these data do not concern us here.

11. This figure is equal to the number of combinations of the two sexes, two sample face amounts, and three sample ages. *See* Appendix A.

12. The cost and payment indexes for Phoenix's non-smoker policies are shown in Appendix A in parentheses below the indexes for the regular policies. Non-smoker policies are available

only if the face amount of the policy is $15,000 or more.

13. These are the Health and Welfare Life Insurance Association, Inc., which issues policies only to employees of non-profit health and welfare institutions, and the Teachers Insurance and Annuity Association of America which issues only to employees of colleges and universities and certain other institutions. Both of these companies sell directly, *i. e.*, without the services of agents. *See Guide, supra* note 7, at 90.

The presence of these two companies skews the range and mean of the cost indexes considerably: one or the other of these companies featured the lowest cost index for 19 of the 24 policies compared. In addition, the tables include four other companies that sell insurance directly to the public, for example, over-the-counter or by direct mail, rather than through agents.[14]

On the basis of the sample policies selected by the defendant in its own *Consumers Shopping Guide For Life Insurance*, therefore, the Court concludes that, in general, the participating whole life insurance policies in Phoenix's portfolio have a relatively low cost. One of the accepted sources in the industry apparently concurs, making the following observations about Phoenix:

> In operations a very important item is expenses, which have been kept remarkably low. Careful selection and underwriting of business has produced a very favorable mortality experience. Policy lapses and surrender have been low. Net cost to policyholders is remarkably low.

1979 Best's Insurance Reports—Life/Health 1507.[15]

## DISCUSSION

Preliminary injunctive relief in this Circuit calls for a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Seaboard World Airlines, Inc. v. Tiger International, Inc.*, 600 F.2d 355, 359 (2d Cir. 1979) (quoting *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam)); *accord, Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir. 1979).

*Irreparable Harm*

Since "low cost" and similar phrases are the cornerstone of plaintiff's advertising campaign, the enforcement of section 4(h) during the pendency of this litigation will necessarily mean a hiatus in that campaign, during which plaintiff will have to cease advertising altogether or adopt a different pitch. If thereafter, as a result of this litigation, plaintiff is permitted to resume its "low cost" advertising, it would be exceedingly difficult to ascertain plaintiff's monetary loss owing to the suspension of its advertising, and even more difficult to determine whether plaintiff could ever recoup such losses. In light of the apparent success of its campaign, however, which the defendant does not dispute, it appears likely that even a brief suspension will result in some loss. Accordingly, the Court finds that continued enforcement of section 4(h) during the pendency of this litigation is likely to cause irreparable harm to the plaintiff.

*Likelihood of Success*

There is no longer any basis for doubting that even advertisements are protected by the first amendment. *See Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Bates v. State Bar of Arizona*, 433 U.S. 350, 381, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977); *Virginia State Board of Pharmacy v. Virginia Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Moreover, as both *Bates* and *Virginia State Board of Pharmacy* noted, commercial information, and particularly comparative price information, may be at least as important, if not more so, than political debate to many consumers. 433 U.S. at 364, 97 S.Ct. at 2699; 425 U.S. at 763, 96 S.Ct. at 1826. The words "low cost" and similar phrases, therefore, in the context of plaintiff's advertisements, do

---

**14.** These are American Republic Life Insurance Company of New York, Nationwide Life Insurance Company, Savings Banks Life Insurance Fund ["SBLIF"], and USAA Life Insurance Company. *See id.* SBLIF is the plaintiff in a related action before this Court, wherein a pre-liminary injunction motion is currently scheduled to be heard on April 3.

**15.** Read into record by counsel for plaintiff at Hearing on Motion for Preliminary Injunction (March 18, 1980).

merit some first amendment protection, and, accordingly, the inquiry must shift to the "proffered justifications for the advertising ban." *See Bates, supra,* 433 U.S. at 364–379, 97 S.Ct. at 2699.

Defendant, by its own regulation, admits that a particular policy may fairly be characterized as low cost, so long as the basis for comparison is an interest-adjusted index. Interestingly enough, the defendant does not define low cost, or establish a cutoff or benchmark against which policies may be measured. Thus, low cost might mean the lowest index, any policy within the lowest decile or quartile, or even any policy with an index below the mean.

Defendant argues, nevertheless, that the phrase "low cost," and similar terms, when used to describe a company's operations or portfolio are "inherently misleading and deceptive to the insurance buying public." [16] In support of this conclusion, defendant makes essentially four points. *First,* defendant argues that no company can honestly claim that every policy in its portfolio is the least expensive available. This the plaintiff does not dispute, and it appears to be true.[17] Thus, continues the defendant, "a person taken in by the phrase 'low cost' with respect to a portfolio could very well end up with a policy having a higher cost than policies which are available from competing companies." [18] It would appear, however, that this danger could be minimized by requiring "low cost" portfolio advertisers to include a statement to the effect that not all of their policies have the lowest cost available.[19] Defendant's regulation, on the other hand, denies even companies whose portfolios consist entirely or for the most part of low cost policies the opportunity to advertise that fact, when such advertising would not be misleading at all. Far from benefitting the public, such a prohibition denies it useful information, for when comparing prices of anything it is often worth beginning with companies or brand names known to offer even a few low cost items. Intelligent consumers—and despite defendant's fears to the contrary, Americans are proving themselves more and more so—can be expected to want such information, and to use it to their own interest.[20]

**16.** Affidavit of Alvin H. Alpert at 2 (filed March 18, 1980).

**17.** But it is just barely true. One company, Teachers Insurance and Annuity Association of America, has a near-perfect record. For the twelve sample participating whole life policies presented in the *Guide,* Teachers rates as follows: Its ten-year cost index is the lowest of all the companies' for 7 of the 12 policies; its twenty-year cost index is the lowest for 10 of the 12 policies. As far as payment indexes are concerned, it does even better: its ten-year payment indexes are the lowest for all twelve policies; its twenty-year indexes are the lowest for 11 of 12 policies.

**18.** Affidavit of Alvin H. Alpert at 3 (filed March 18, 1980).

**19.** Defendant draws an interesting analogy to "Corporate Average Fuel Economy" ["CAFE"], which is an average of the EPA mileage estimates of all model cars produced by an automobile manufacturer. Defendant argues: "The fact that Ford may have the highest fleet mileage is not relevant to the consumer, and would be misleading and deceptive if the company were to use this fact as a sales tool." *Id.* at 5. Ford obviously thinks not, however. Just this morning, a popular New York radio station broadcast a commercial advertisement by Ford stressing that it has the highest CAFE for 1980 of American automobile manufacturers. The ad concluded with a warning that CAFE is an average and therefore consumers should consult EPA estimates for individual cars. This ad has run for some time and Ford has begun to use similar ads on television.

**20.** In *Bates, supra,* the Supreme Court rejected a similar argument against allowing attorneys to advertise their prices for various legal services:

> [I]t seems peculiar to deny the consumer, on the ground that the information is incomplete, at least some of the relevant information needed to reach an informed decision. The alternative—the prohibition of advertising—serves only to restrict the information that flows to consumers. Moreover, the argument assumes that the public is not sophisticated enough to realize the limitations of advertising, and that the public is better kept in ignorance than trusted with correct but incomplete information. We suspect the argument rests on an underestimation of the public. In any event, we view as dubious any justification that is based on the benefits of public ignorance.

433 U.S. at 374–75, 97 S.Ct. at 2704 (footnote omitted).

*Second,* defendant argues that the low cost of a company's operations may never be reflected in the costs to its policyholders. This is accurate only insofar as the mortality of the company's policyholders and the performance of its investments are also factors. But since a mutual company has no stockholders, economical operations and favorable investment performance and mortality will to a virtual certainty benefit policyholders. Again, a prohibition on such information goes far beyond anything needed to prevent deception; it denies consumers valuable information. As the plaintiff somewhat snidely points out, it is odd that the defendant prefers ads that offer "a piece of the rock," or a company that "really stands by you," to ones that offer objectively verifiable comparative cost information.

*Third,* the defendant argues that rates change, and therefore, that any comparative cost data may present an outdated, and thus inaccurate, picture. This is true, but it is also a non sequitur, for it describes virtually everything. The solution, as even the defendant appears to acknowledge, is to require any statement about costs to include a reference date.[21]

*Fourth,* and finally, defendant suggests that it would be exceedingly difficult, if not impossible, to draw a line beyond which companies would not be permitted to call their portfolios "low cost." The best evidence to the contrary, however, is the defendant's own regulation which requires it to draw such lines for particular policies. No doubt establishing a standard for entire portfolios will be somewhat more difficult, but surely the defendant underestimates its own ingenuity.

The Court concludes, therefore, on the basis of what has been presented thus far,

---

**21.** Some of the plaintiff's advertisements already do this.

that the phrase "low cost" is not inherently misleading or deceptive when describing a company's operations or portfolio. Furthermore, when used to describe the participating whole life policies in plaintiff's portfolio, it communicates useful information. Thus, it appears that the regulation unconstitutionally infringes the plaintiff's rights under the first amendment.

This is, of course, not to say that the defendant may not regulate insurers' advertising claims about comparative costs. "Advertising that is false, deceptive, or misleading of course is subject to restraint." *Bates, supra,* 433 U.S. at 383, 97 S.Ct. at 2709. Moreover, the Court does not "foreclose the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required" of even truthful advertising about comparative costs. *See id.* at 384, 97 S.Ct. at 2709. But any regulation designed to prevent fraud and deception and to guarantee complete and accurate information to consumers must be "narrowly drawn . . . to serve those interests without unnecessarily interfering with First Amendment freedoms." *Village of Schaumburg, supra,* 444 U.S. at 637, 100 S.Ct. at 836.

## CONCLUSION

In accordance with the foregoing, the Court finds the plaintiff entitled to a preliminary injunction against the defendant, enjoining it from enforcing Section 219.4(h) of Regulation 34A, 11 N.Y.C.R.R., against the plaintiff during the pendency of this action. These are the Court's reasons pursuant to Rule 65(d) of the Federal Rules of Civil Procedure.

Submit Order on Notice.

So ordered.

## APPENDIX A

### COMPARATIVE INTEREST-ADJUSTED INDEXES[1]

| POLICY | | | 10-YEAR PAYMENT | | | 10-YEAR COST | | | 20-YEAR PAYMENT | | | 20-YEAR COST | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sex | Face Amt.[2] | Age[3] | Mean | P-M[4] | Low | Mean | P-M | Low | Mean | P-M | Low | Mean | P-M | Low |
| M | 10 | 20 | 12.49 | 12.21 | 8.48* | 5.51 | 4.26 | 2.39 | 11.17 | 10.66 | 7.20 | 4.36 | 3.02 | 1.89* |
| " | " | 35 | 19.41 | 18.78 | 13.04* | 7.61 | 5.98 | 3.59** | 17.40 | 16.76 | 10.78* | 6.96 | 5.37 | 2.26* |
| " | " | 50 | 33.91 | 31.12 | 23.64* | 15.82 | 11.97 | 8.48* | 30.74 | 28.49 | 19.77* | 16.24 | 12.97 | 7.21* |
| " | 25 | 20 | 11.62 | 11.49 (8.38) | 7.34* | 4.59 | 3.54 (3.24) | 2.19** | 10.32 | 9.94 (8.94) | 7.98*a | 3.50 | 2.30 (2.43) | 1.10* |
| " | " | 35 | 18.47 | 18.06 (12.42) | 11.89* | 6.60 | 5.26 (3.72) | 2.86* | 16.46 | 16.04 (13.77) | 9.63* | 6.02 | 4.65 (3.86) | 1.11* |
| " | " | 50 | 32.81 | 30.40 (20.85) | 22.50* | 14.64 | 11.25 (8.43) | 7.34* | 29.49 | 27.77 (24.17) | 17.17*b | 15.09 | 12.25 (10.73) | 6.07* |
| F | 10 | 20 | 11.85 | 11.71 | 7.52* | 5.07 | 3.76 | 2.39 | 10.57 | 10.16 | 6.48* | 3.98 | 2.52 | 1.75* |
| " | " | 35 | 18.00 | 17.38 | 11.11* | 6.50 | 4.58 | 3.15* | 16.08 | 15.36 | 9.20* | 5.82 | 3.97 | 1.46* |
| " | " | 50 | 30.71 | 28.02 | 18.99* | 13.00 | 8.87 | 5.16* | 27.61 | 25.39 | 15.72* | 13.33 | 9.87 | 3.94* |
| " | 25 | 20 | 10.98 | 10.99 (7.95) | 6.38* | 4.14 | 3.04 (2.80) | 2.19** | 9.71 | 9.44 (8.43) | 5.33* | 3.07 | 1.80 (1.93) | .96* |
| " | " | 35 | 17.07 | 16.66 (11.44) | 9.96* | 5.51 | 3.86 (2.73) | 2.00* | 15.10 | 14.64 (12.57) | 8.06* | 4.96 | 3.25 (2.66) | .32* |
| " | " | 50 | 29.58 | 27.30 (18.84) | 17.85* | 11.99 | 8.15 (6.43) | 4.02* | 25.52 | 24.67 (21.64) | 14.58* | 12.49 | 9.15 (8.20) | 2.80* |

1. Source: N.Y. Insurance Dep't, Consumers Shopping Guide For Life Insurance 46 53, 72 79, 90 (1977) (Based on 5% interest rate) (indexes expressed in dollars per $1,000 of face amount).

2. In thousands of dollars.

3. Fourteen companies use age at last birthday to calculate premiums; the remaining forty-nine use age at nearest birthday.

4. "P M" stands for Phoenix Mutual. Figures in parentheses are indexes for non-smoker policies, which are available only for face amounts of $15,000 or more.

* Policy offered by company that does not issue to general public.

** Policy offered by direct sales to general public, rather than through agents.

a. This figure appears to be an error, since the payment index for a policy offered by Teachers Insurance and Annuity Association of America is lower.

b. This figure is suspicious in light of the other cost and payment indexes of the company's policies.