MEDICAL MALPRACTICE INSURANCE ASSOCIATION, Respondent, v MARIO CUOMO, as Governor of the State of New York, et al., Appellants.

First Department, June 30, 1988

## APPEARANCES OF COUNSEL

*T. Richard Kennedy* of counsel *(John M. Nonna* and *David N. Bodek* with him on the brief; *Werner, Kennedy & French,* attorneys), for respondent.

*Kathie Ann Whipple* of counsel *(Jane Breslin Jacobs, Ann Horowitz* and *Richard G. Liskov* with her on the brief; *Robert Abrams, Attorney-General,* attorney), for appellants.

## OPINION OF THE COURT

SULLIVAN, J. P.

At issue in this action challenging their constitutionality is the propriety of preliminarily enjoining the implementation and enforcement of certain provisions of Laws of 1986 (ch 266, § 11), the Medical Malpractice Reform Act of 1986, requiring Medical Malpractice Insurance Association (MMIA) to refund stabilization reserve fund charges which it had collected on excess policies and applied as authorized by statute to offset deficits. Since we believe that MMIA is ultimately likely to succeed on the merits, that it would be irreparably harmed if such relief were not granted and that, on balance, the equities favor it, we affirm the motion court's grant of a preliminary injunction.

MMIA, "a non-profit unincorporated association constituting a legal entity separate and distinct from its members" (Insur-

ance Law § 5502 [b]), was created by Laws of 1975 (ch 109, § 17), after the insurer then covering most physicians and surgeons for professional liability advised that it would no longer underwrite such insurance in New York, "to provide * * * a market for medical malpractice insurance" not otherwise readily available. (Insurance Law § 5502 [c], [d].) For all insurance companies directly writing personal injury liability insurance in New York State, membership in MMIA is a condition of authority to transact business (§ 5502 [a]).

MMIA is statutorily required to provide malpractice insurance to all physician applicants with primary policy limits of $1,000,000 per claim and $3,000,000 for all claims in any one policy year. (Insurance Law § 5502 [e] [1]; see also, L 1986, ch 266, § 11.) In 1985, the Legislature mandated that all authorized insurers issuing medical malpractice insurance with the required primary policy limits provide excess coverage of at least $1,000,000 per claim and $3,000,000 aggregate for any one policy year to their insureds. (L 1985, ch 294, § 17.) MMIA was required, however, to provide excess coverage not only to its insureds but also to all applicants irrespective of the placement of their primary medical malpractice coverage. (L 1985, ch 294, §§ 17, 18; L 1986, ch 266, § 11.) Consistent with this legislative directive, MMIA offered, on and after July 1, 1985, policies of excess insurance.

MMIA, from its very inception, has been required to maintain a stabilization reserve fund for the purpose of offsetting deficits. (See, Insurance Law § 5509 [a]; L 1975, ch 109, § 17.) At the time of the commencement of this action, MMIA had collected more than $10,000,000 in stabilization reserve fund charges upon the 1985-1986 excess coverage policies which it issued. In addition, subsequent to the commencement of this action, there remained unpaid balances for stabilization reserve fund charges earned by MMIA on excess policies in effect between July 1, 1985 and June 30, 1986.

In or about July 1986, as part of the Medical Malpractice Reform Act of 1986, the Legislature enacted an amendment to section 5502 of the Insurance Law (L 1986, ch 266, § 11), known as section 11. As amended, section 5502 provides that policies furnishing excess insurance coverage, including those issued commencing July 1, 1985, "shall not be subject to the stabilization reserve fund charge established by section five thousand five hundred nine" of the Insurance Law. In addition, the 1986 amendment requires MMIA to refund excess stabilization reserve fund charges to the hospitals that have

paid the premium and surcharge on behalf of their doctors for the period between July 1, 1985 and June 30, 1986.

MMIA's deficit for the year ending December 31, 1985 was approximately $80 to $85 million. Even the Insurance Department has conceded that a deficit exists. At the end of the 1985 calendar year, the earned portion of the stabilization reserve fund was transferred, with the Department's express acquiescence, to MMIA's premium account to offset its deficit, which arose from inadequate rates in prior years. MMIA's use of the stabilization reserve fund charges collected on excess policies to offset its deficit is authorized by Insurance Law § 5509 (a), which provides: "[MMIA] shall maintain a stabilization reserve fund. The fund shall be used for payment to the association of any deficit, or for reimbursement to the association's members for payment of any deficit arising out of the operations of the association. A deficit shall exist whenever the sum of the premiums collected by the association and the investment income on policyholder supplied funds is exhausted in payment of the association's administrative expenses, reserves for loss, reserve for loss adjustment expenses, loss and loss adjustment expenses, and taxes."

It is estimated that the amended provisions of section 5502, which require MMIA to return in excess of $10,000,000 in stabilization reserve fund charges collected from hospitals on the excess coverage policies, will increase MMIA's deficit as of December 31, 1985, to approximately $90 to $95 million. Thus, simultaneously with the commencement of this declaratory action MMIA moved "for an order preliminarily enjoining the implementation of the provision of Section 11 of chapter 266 of the Laws of 1986 that requires MMIA to refund to excess policyholders stabilization reserve fund charges collected since July 1, 1985." The defendants, the Governor and Superintendent of the Department of Insurance, thereafter cross-moved to dismiss MMIA's complaint for failure to state a cause of action. The motion court denied the cross motion and, as noted, enjoined the State of New York "from enforcing that provision of Section 11 of chapter 266 of the Laws of 1986 which requires MMIA to refund to excess policyholders stabilization reserve fund charges collected since July 1, 1985." In addition, the court enjoined the State from preventing MMIA's collection of previously uncollected stabilization reserve fund charges for policies issued between July 1, 1985 and June 30, 1986.

Where the constitutionality of a statute is challenged, an

injunction prohibiting its implementation pending litigation is appropriate. *(See, e.g., Phoenix Mut. Life Ins. Co. v Insurance Dept.,* 500 F Supp 2.) To withhold relief while illegal enforcement of an unconstitutional statute strips a litigant of a constitutionally protected right would defeat the purpose of the declaratory action. *(Niagara Recycling v Town of Niagara,* 83 AD2d 316, 328-329, 334.) The granting of such preliminary relief is contingent upon a demonstration that the moving party is likely ultimately to succeed on the merits and that, in the absence of a preliminary injunction, it will suffer irreparable injury *(supra,* at 324). In addition, the moving party must demonstrate that a balancing of the equities favors its position. In the circumstances presented here, the motion court correctly found that MMIA had demonstrated entitlement to a preliminary injunction.

■ While MMIA does not dispute the Legislature's prerogative to regulate the insurance industry, the right to regulate by exercise of the State's police power is not absolute. For example, in *Brooks-Scanlon Co. v Railroad Commn.* (251 US 396, 399), the United States Supreme Court concluded that a regulated entity "cannot be compelled to carry on even a branch of business at a loss, much less the whole business". If section 11 is given retroactive effect, MMIA will be compelled to refund moneys that it has already collected and used partially to offset its huge deficit.[1] Thus, MMIA will operate at an even greater loss.

The courts of this State have consistently held that in order to pass constitutional muster under the Due Process Clauses of the New York State and United States Constitutions, a legislative exercise of the police power must not be arbitrary or unreasonable, and it must be reasonably related to the health, comfort, safety and welfare of the community. *(See, Health Ins. Assn. v Harnett,* 44 NY2d 302, 309; *Montgomery v Daniels,* 38 NY2d 41, 54; *Paterson v University of State of N. Y.,* 14 NY2d 432, 438; *Niagara Recycling v Town of Niagara, supra,* 83 AD2d, at 326.) Where a law such as Laws of 1986 (ch 266, § 11) would have retroactive effect, the courts scrutinize the legislation more closely to examine "whether the law is reasonably calculated to serve a compelling public interest * * * and the extent to which retrospective application creates unfairness" *(supra,* at 326; *accord, Peoples Sav. Bank v County Dollar Corp.,* 43 AD2d 327, *affd* 35 NY2d 836).

---

1. MMIA is not challenging the Legislature's power prospectively to extinguish MMIA's right to collect stabilization reserve fund charges.

Moreover, retroactive legislation may not impair or destroy vested rights. *(Matter of McGlone,* 284 NY 527, 533, *affd sub. nom. Irving Trust Co. v Day,* 314 US 556; *Niagara Recycling v Town of Niagara, supra,* 83 AD2d, at 326.)* "The ultimate evil of a deprivation of property, or better, a frustration of property rights, under the guise of an exercise of the police power is that it forces the owner to assume the cost of providing a benefit to the public without recoupment." *(French Investing Co. v City of New York,* 39 NY2d 587, 596, *appeal dismissed* 429 US 990, *rearg denied* 40 NY2d 846.)

Property rights subsumed within the Fourteenth Amendment's protection of property are broadly construed. *(Board of Regents v Roth,* 408 US 564, 571.)* "[T]he property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money" *(supra,* at 571-572).* MMIA's interest in the fund is not a mere "unilateral expectation", but rather, "a legitimate claim of entitlement" to those funds already collected from its insureds, deposited in the stabilization reserve fund and intended and used to offset its deficit. *(See, supra,* at 577; *Webb's Fabulous Pharmacies v Beckwith,* 449 US 155, 161.)* A fund existing for the benefit of a corporation's creditors clearly is private property *(Board of Regents v Roth, supra,* at 577).* MMIA's interest in the stabilization reserve fund is a property interest upon which MMIA has and continues to rely, a "reliance that must not be arbitrarily undermined" *(Supra,* at 577).

 MMIA's right to maintain and use the amounts collected for the stabilization reserve fund is, as already noted, founded upon section 5509 (a) of the Insurance Law, which at all times relevant to this litigation, in part, provided: "[MMIA] shall maintain a stabilization reserve fund. The fund shall be used for payment to the association of any deficit". Thus, contrary to defendants' assertion, the statute expressly manifests MMIA's property right in amounts collected for the stabilization reserve fund.

That MMIA has an enormous deficit, one that amounted to approximately $80 to $85 million for the year ending December 31, 1985, is beyond dispute. Thus, at the end of 1985 the earned portion of the stabilization reserve fund was transferred to MMIA's premium account to offset its deficit. The amounts collected as stabilization reserve charges on excess policies effective between July 1985 and June 1986 have now been earned and used to offset MMIA's ongoing deficit. Al-

though transfers to the stabilization reserve fund were made with the acquiescence of the Insurance Department, the statute does not require such consent as a precondition to transfer. *(See,* Insurance Law § 5509 [a].) Nor, as claimed by defendants is MMIA's right to use the stabilization reserve fund charges to offset its deficit contingent upon or subject to the will of governmental authority.

Defendants cite *Methodist Hosp. v State Ins. Fund* (64 NY2d 365, *appeal dismissed* 474 US 801) for the proposition that a property interest cannot be asserted in a fund created by statute. This position is untenable. The rule articulated in *Methodist Hosp.* is not that a property interest cannot exist in a fund created by statute, but rather, that State Insurance Fund policyholders could not assert a property interest in a fund created and existing as a State agency *(supra,* 64 NY2d, at 374-376). MMIA is not a State agency. It is a "non-profit unincorporated association". (Insurance Law § 5502 [b].) Moreover, its assets are not the property of the State. In particular, MMIA is required to maintain the stabilization reserve fund to offset deficits as defined by a statutory formula. (Insurance Law § 5509 [a]; *accord, Webb's Fabulous Pharmacies v Beckwith, supra,* 449 US, at 161-162.) Indeed, the statute is devoid of language which would indicate even a scintilla of State control over the fund.

In support of its decision in *Methodist Hosp. (supra)* that the State Insurance Fund was created as and exists as a State agency, the Court of Appeals distinguished the fund from a mutual insurance company. Found determinative were the creation of the fund "as a State agency within the Department of Labor"; the administration of the fund by commissioners appointed by the Governor with the advice and consent of the Senate; custodianship of the fund by the Commissioner of Taxation and Finance; and, most importantly, the State's acceptance of liability beyond the amount of the fund. *(Supra,* 64 NY2d, at 374-376.)

In striking contrast, MMIA's stabilization reserve fund exists neither as an entity within the Insurance Department nor any other State agency. In addition, although MMIA's board of 15 directors includes the Superintendent of Insurance as a nonvoting member (Insurance Law § 5508 [a]), the fund is administered solely by MMIA and not by any governmental entity; MMIA is the exclusive custodian of the fund; and the State does not assume liability for inadequacies in MMIA's

stabilization reserve fund *(see,* Insurance Law § 5507 [b]). In sum, the reasoning in *Methodist Hosp. (supra)* actually demonstrates MMIA's legitimate property interest in the stabilization reserve fund.

The Fifth Amendment's prohibition against the taking of private property "for public use, without just compensation" applies to the States through the Fourteenth Amendment, which bars the States from "depriv[ing] any person of * * * property, without due process of law". *(See also, Webb's Fabulous Pharmacies v Beckwith,* 449 US 155, *supra; Penn Cent. Transp. Co. v New York City,* 438 US 104, *reh denied* 439 US 883.) New York has expressly provided these protections to its citizens through its Constitution (art I, § 6). In *Hospital Assn. v Axelrod* (113 AD2d 9), the Third Department concluded that the imposition upon hospitals of the cost of excess insurance coverage for their private physicians would result in an absolute appropriation of the hospitals' property. Similarly, in the present case, an appropriation of MMIA's stabilization reserve fund, in which it has a vested property right, would constitute an unconstitutional deprivation of property in violation of due process.

In support of their contention that enforcement of section 11 would not result in a taking in violation of MMIA's due process rights, defendants rely upon *Keystone Bituminous Coal Assn. v DeBenedictis* (480 US 470, 94 L Ed 2d 472). *Keystone,* however, is distinguishable from the present case in that, there, the plaintiffs claimed that a Pennsylvania statute which prohibited them from mining certain underground coal constituted a taking of their private property without compensation in violation of the Fifth and Fourteenth Amendments. Noting that cases involving a taking must be decided on each case's " 'particular facts' ", the Supreme Court concluded that the statute was not unconstitutional on its face *(supra,* 480 US, at —, 94 L Ed 2d, at 481). The court based its decision on two factors. It initially determined that the statute, which bars mining companies from engaging in activity damaging to the land surface, restrained activity that amounted to a public nuisance *(supra,* 480 US, at —, 94 L Ed 2d, at 488-493.) Land use regulation of this nature, it reasoned, does not constitute a taking "since no individual has a right to use his property so as to create a nuisance or otherwise harm others" *(supra,* 480 US, at —, n 20, 94 L Ed 2d, at 492, n 20). In addition, the court concluded that the taking claim was without merit since the plaintiffs had failed to demonstrate that the statute made

it "commercially impracticable" for them to continue their business (*supra*, 480 US, at —, 94 L Ed 2d, at 493-499).

MMIA's collection of stabilization reserve fund charges on policies effective between July 1, 1985 and June 30, 1986 is hardly analogous to the use of property in a manner that constitutes a public nuisance and, thus, section 11 cannot be justified as being necessary to the abatement of such activity. Moreover, MMIA is required to provide excess coverage insurance by legislative fiat. (L 1986, ch 266, § 11; L 1985, ch 294, §§ 17, 18.) Despite defendants' assertions to the contrary, enforcement of section 11 would make it "commercially impracticable" for MMIA to continue to offer excess insurance. The parties are in agreement that MMIA, an insolvent insurer pursuant to the provisions of section 1309 of the Insurance Law, is saddled with a massive deficit. It is estimated that enforcement of section 11 would increase MMIA's deficit by an amount in excess of $10,000,000 and deprive it of a precious and necessary resource with which to cope with that deficit.[2] It is repugnant to the Due Process Clause of the Fourteenth Amendment of the US Constitution to compel a regulated entity "to carry on even a branch of business at a loss". (*Brooks-Scanlon Co. v Railroad Commn., supra*, 251 US, at 399.) Consequently, under the "particular facts" proffered in support of the preliminary injunction, MMIA has demonstrated that enforcement of section 11 would result in a taking violative of its due process rights.

■ Having shown a likelihood of ultimate success on the merits of its constitutional claim, MMIA is entitled to the issuance of a preliminary injunction since, in its absence, it would be irreparably harmed and, on balance, the equities favor it. Enforcement of section 11 would cause irreparable harm to MMIA because it would be forced to refund immediately more than $10,000,000 in stabilization reserve fund charges from operating income that is necessary to meet obligations incurred with respect to excess policies effective between July 1, 1985 and June 30, 1986. In the absence of a preliminary injunction, MMIA, as a practical matter, would, despite a favorable outcome in this action, be unable to recoup the distributed funds. The amounts paid or credited to individ-

2. MMIA notes that if it had reason to suspect that the Legislature could retroactively require a refund of stabilization reserve fund charges, it could have either challenged the mandate to provide excess coverage or sought a higher rate for excess coverage. (*See, e.g., Hospital Assn. v Axelrod*, 113 AD2d 9.)

ual hospitals, if not repaid voluntarily, could not economically be recovered in plenary actions because the amounts due on the policies are small. Moreover, the administrative costs entailed in pursuing recovery of refunded stabilization reserve fund charges could not be recovered from either the Insurance Department or the individual hospital policyholders.

■ A balancing of the equities also commands issuance of a preliminary injunction. Defendants argue that the preliminary injunction has "altered the complicated fee reimbursement schedule of which this refund is an important component." Significantly, however, they fail to offer any explanation as to how this unspecified schedule would be affected. It should be noted though, in light of MMIA's likelihood of ultimate success on the merits, that a refund and subsequent recovery of the amounts refunded would seemingly compound the adverse impact on that unspecified schedule. Thus, preservation of the status quo pending a final determination of the action strikes an appropriate balance of the interests of all parties.

As is readily apparent from the foregoing, defendants' cross motion to dismiss the complaint for failure to state a cause of action was properly denied.

Accordingly, the order of the Supreme Court, New York County (Martin Evans, J.), entered February 4, 1987, granting MMIA's motion for a preliminary injunction and denying defendants' cross motion to dismiss the complaint, should be affirmed, without costs or disbursements.

ASCH, J. (dissenting). The plaintiff Medical Malpractice Insurance Association (Association) was created by the New York Legislature in 1975 (L 1975, ch 109, § 17) to meet a crisis created by the withdrawal of the leading medical malpractice insurer from this market. The Association is an unincorporated and nonprofit group of all the insurers writing personal injury liability insurance in New York State. It is a legal entity separate and distinct from its members (Insurance Law § 5502 [b]). It offers primary policies with limits up to $1,000,000 per single claim and $3,000,000 for all claims in any one policy year (Insurance Law § 5502 [e] [1]) to physicians and surgeons who choose to apply.

All the authorized insurers which issue primary medical malpractice insurance having the policy limits described above were directed in 1985, by the Legislature, to provide excess coverage to their primary insureds of at least $1,000,000 per

claimant and $3,000,000 for all claimants (L 1985, ch 294, § 17). However, the Association must not only offer such coverage to its own insureds in excess of the primary limits, but also must offer excess malpractice coverage to all applicants irrespective of their primary insurer (L 1986, ch 266, § 11; L 1985, ch 294, §§ 17, 18).

In connection with the initial legislation creating the Association, the Legislature set up a stabilization reserve fund which was to be used to offset any deficits arising out of its operations (Insurance Law § 5509; L 1975, ch 109, § 17). The reserve fund for primary policies was funded by the Association's physician insureds, who were required to pay a 20% premium over the annual rate until the fund exceeded $50,000,000 (Insurance Law § 5509 [b]).

In reform legislation enacted in 1985 to ameliorate the burden of exorbitant insurance premiums on practicing physicians, the Legislature provided that the premium and the 20% reserve fund premium charge for excess policies effective between July 1, 1985 and June 30, 1986 were to be paid by the hospital for any attending physician at such hospital (L 1985, ch 294, § 19).

The Association issued these excess policies subject to the same 20% surcharge which it applied to all primary policies and, as a result, it collected large premium amounts from hospitals for the excess coverage, with the 20% surcharge being deposited into the stabilization reserve fund.

The Medical Malpractice Reform Act of 1986 (L 1986, ch 266) was enacted to correct the "upward pressure on already high malpractice premiums" (L 1986, ch 266, § 1). To reduce the costs of malpractice insurance, the Legislature enacted various changes to the Insurance Law, including giving authority to the Superintendent of Insurance to establish medical malpractice insurance rates for the period commencing July 1, 1985 through June 30, 1988, and providing that the Superintendent could establish surcharges on premiums after July 1, 1989, to satisfy any projected deficits as a result of the rates established for the target period of 1985-1988 (see, Matter of Medical Malpractice Ins. Assn. v Superintendent of Ins., — AD2d —, — [Asch, J., dissenting]).

To further ameliorate the burden on physicians and to meet the spiraling costs of health care, the Legislature provided that excess policies, including those issued in the retrospective period of 1985-1986, would not be subject to the stabilization

reserve fund charge (Insurance Law § 5502, as amended by Laws of 1986, ch 266). This amendment additionally provided that the Association should refund or credit the accounts of hospitals which paid this surcharge on excess insurance on behalf of physicians during the retrospective period.

These provisions (L 1986, ch 266, §§ 11, 40) precipitated the instant declaratory judgment action by the Association. It sought a declaration that Laws of 1986 (ch 266, §§ 11, 40) are invalid under the US and NY Constitutions, in that they deprive the Association of due process of law, interfere with vested property rights and abrogate preexisting contractual obligations.

The court at nisi prius denied the defendants' motion to dismiss the complaint pursuant to CPLR 3211 but did not address the issues raised by the parties with respect to section 40 and the rates promulgated thereunder by the Superintendent's use of surcharges after July 1, 1989 to keep the rates in the 1985-1988 target period as low as possible. Since this was challenged by plaintiff and discussed in *Matter of Medical Malpractice Ins. Assn. v Superintendent of Ins. (supra* [dissent by Asch, J.]), and since for the most part the parties do not address this issue on this appeal, I will confine my discussion to Laws of 1986 (ch 266, § 11), the court's denial of defendants' motion to dismiss as to that claim and its grant of a preliminary injunction enjoining the implementation of section 11.

It is black letter law that courts will strongly presume the constitutionality of a legislative enactment. Statutes will be struck down only as a last resort when unconstitutionality is shown beyond a reasonable doubt *(I.L.F.Y. Co. v City Rent & Rehabilitation Admin.,* 11 NY2d 480, 490). Our Court of Appeals has cogently stated the test under both our Federal and State Constitutions as follows: "In *West Coast Hotel Co. v Parrish* (300 US 379, 391) the United States Supreme Court stated that 'regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process'. Thus where a statute is challenged on nonprocedural grounds as violative of due process of law we have consistently asked the question whether there is ' " 'some fair, just and reasonable connection' between it and the promotion of the health, comfort, safety and welfare of society" '. *(Nettleton Co. v Diamond,* 27 NY2d 182, 193, app dsmd *sub nom. Reptile Prods. Assn. v Diamond,* 401 US 969; *People v Pagnotta,* 25 NY2d 333, 337; *People v Bunis,* 9 NY2d 1, 4; *Defiance Milk Prods. Co. v Du Mond,* 309 NY 537, 541.)"

*(Montgomery v Daniels,* 38 NY2d 41, 54.) Further, that court noted that if the law is reasonably related to the promotion of public welfare and is, therefore, a legitimate exercise of the State's police power, it need not represent the only or even the wisest method the Legislature could have utilized to meet the perceived need *(supra,* at 56).

Neither the Federal nor State Constitutions (with the exception of the proscription of bills of attainder and ex post facto laws in the former [art I, §§ 9, 10]) contain any prohibition against retroactive laws per se. In determining the validity of such laws, it has been stated generally that only those which impair or destroy *vested* property rights will be deemed unconstitutional *(see, Saltser & Weinsier v McGoldrick,* 295 NY 499, 509).

However, even this principle is regarded as too broad a restriction, unless vested rights are deemed to be property interests so substantial as to justify governmental deprivation in light of the objectives to be achieved by the governmental action *(see, People v Miller,* 304 NY 105).

Thus, it has been stated by Judge (then Justice) Titone that: "The retrospective application of new legislation may offend the due process clause if, upon balancing the considerations on both sides, it appears that retrospective application would be unreasonable (see *Chase Securities Corp. v Donaldson,* 325 US 304). In determining the reasonableness of retrospective application, the 'rigidities of old theories of "vested rights" ' have been rejected in favor of the consideration of several factors, i.e., fairness to the parties, reliance on pre-existing law, the extent of retroactivity, and the nature of the public interest to be served by the law (see *Matter of Chrysler Props. v Morris,* 23 NY2d 515, 518, 521; Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv L Rev 692, 697)." *(Valladares v Valladares,* 80 AD2d 244, 251, *affd* 55 NY2d 388.)

Plaintiff contends that section 11 refunding or crediting the excess premiums to the hospitals which paid them in the 1985-1986 period constitutes a deprivation of its vested property interest in that stabilization reserve fund, that it violates the 14th Amendment of the US Constitution and section 6 of article I, of the NY Constitution, since it is arbitrary and bears no rational relationship to any valid State interest. Further, plaintiff contends section 11 also violates section 10 of article I of the US Constitution, in that it impairs existing

contracts and other relations between it and its excess policy-holders.

Property rights or interests, such as that claimed by plaintiff in the stabilization reserve fund, may be based upon statute, contract or from an agreement reasonably implied from the promisor's words or conduct *(Perry v Sindermann,* 408 US 593, 602). They are not created by the Constitution and/or by a simple subjective expectancy, but must be found in an independent source such as State law *(supra,* at 602, n 7; 603; *Board of Regents v Roth,* 408 US 564, 577).

When the Legislature enacted the stabilization reserve fund, it did so because it recognized that the rates might prove to be inadequate. Thus, it provided for the 20% surcharge to be utilized "for payment to the association of any deficit * * * arising out of the operations of the association" (Insurance Law § 5509 [a] [formerly § 688]).

It is clear the Legislature never intended that these funds were to be the absolute property of the Association since the act provides for the return of the moneys paid to the policy-holders, upon termination of the Association, if there are excess funds then remaining (Insurance Law § 5509 [c]).

The fund is held by the Association separately in a trust and its use is strictly limited by statute, subject to the consent of the Department of Insurance. Thus, there is no vested property right to the 1985-1986 surcharges within the meaning of *Roth (supra). (See, Methodist Hosp. v State Ins. Fund,* 64 NY2d 365; *see also, American Ins. Assn. v Bouchard,* 102 AD2d 775, *mod on other grounds sub nom. American Ins. Assn. v Chu,* 64 NY2d 379, *appeal dismissed and cert denied* 474 US 803.)

Section 11 promotes the interest of this State in reducing the cost of health care. The large payments into the stabilization reserve fund were not anticipated by the Legislature. These arose only because the Association became, by default, the insurer of the great majority of the policies of excess coverage. When the Reform Act of 1986 was enacted, the Legislature decreed that a partial return of the 1985-1986 surcharge would promote fairness and reduce costs to the health care community. Since the statute which was corrected had been in effect for less than a year, the Legislature modified its unanticipated results by the remedial enactment of section 11. Thus, the Legislature acted "in pursuit of permissible State objectives" in enacting section 11, and the

means it adopted, i.e., refunding payments to the hospitals which are primarily responsible for the excess premiums payments, "were * * * reasonably related to the accomplishment of those objectives" *(Montgomery v Daniels, supra,* at 54).

The surcharge herein was imposed not by the terms of the contracts of insurance between the plaintiff Association and its insureds, but by the application of Insurance Law article 55. Thus, there can be no viable impairment of contract claim.

Even assuming the legislation does interfere with plaintiff's contracts with third parties, there is no *unconstitutional* impairment since the legislation is addressed to a legitimate end and the means employed to obtain that end are reasonable and appropriate *(Matter of Farrell v Drew,* 19 NY2d 486, 493; *see also, United States Trust Co. v New Jersey,* 431 US 1, 22-23) and any claimed impairment is not such a substantial one as to merit constitutional scrutiny *(Allied Structural Steel Co. v Spannaus,* 438 US 234).

Plaintiff has not only failed to make a showing of the likelihood of its success on the merits as detailed above, but it has also not shown irreparable harm absent a grant of injunctive relief. Assuming, arguendo, plaintiff prevails in this action, both it and the Department of Health, under that agency's statutory control of hospitals pursuant to article 28 of the Public Health Law, would have the ability to require the hospitals to return any moneys paid. Finally, a balancing of the equities also does not favor injunctive relief. Delay of the refunds authorized by section 11 will interfere with the hospital fee reimbursement schedule and the Legislature's plan to lower health care costs. Denial will simply work a temporary monetary harm upon plaintiff, which can be fully recovered by it if it prevails.

Accordingly, I would reverse the order of the Supreme Court, New York County (Martin Evans, J.), entered February 4, 1987, deny plaintiff's motion for a preliminary injunction of the implementation of Laws of 1986 (ch 266, § 11) and grant defendants' cross motion to dismiss the complaint.

CARRO and SMITH, JJ., concur with SULLIVAN, J. P.; ASCH and MILONAS, JJ., dissent in an opinion by ASCH, J.

Order, Supreme Court, New York County, entered on February 4, 1987, affirmed, without costs and without disbursements.