■ In the Matter of MEDICAL MALPRACTICE INSURANCE ASSOCIATION, Respondent, v SUPERINTENDENT OF INSURANCE OF THE STATE OF NEW YORK, Appellant.—Judgment, Supreme Court, New York County (Martin Evans, J.), entered on October 21, 1987, affirmed for the reasons stated by Martin Evans, J., without costs and without disbursements. Concur—Kupferman, J. P., Sullivan and Kassal, JJ.

Asch and Rosenberger, JJ., dissent in the following memorandum by Asch, J. In rejecting the determination of the Superintendent of Insurance, the majority rejects the labors of successive Legislatures, two Governors of the State of New York, representatives of the public and the medical profession, all of whom have struggled to fashion a solution for the awesome problem of accelerating medical malpractice insurance costs. The result of their efforts, in my opinion, is a feasible plan to restrain such insurance rates, a plan which is clearly supported by statute and principles of constitutional law. Accordingly, I would reverse the judgment and order which granted petitioner's CPLR article 78 petition and annulled the Superintendent's determination as set forth in Regulation No. 101 (11 NYCRR 70.8) and the amendments thereto.

The Legislature, with former Governor Carey, enacted, in 1975, current article 55 of the Insurance Law, enabling petitioner Medical Malpractice Insurance Association (Association) to act as a nonprofit joint underwriting association of insurers. Under this legislation, the Association is to provide coverage at the lowest possible rates consistent with solvency and reasonable rates and surplus (Insurance Law § 5505).

The rates, however, continued to spiral upward, prompting modification by the Legislature of substantive and procedural rules relating to medical malpractice suits (see, L 1985, ch 294; L 1986, ch 266). The Medical Malpractice Reform Act of 1986 (L 1986, ch 266) amended the CPLR, Insurance Law, Public Health Law and other statutes, declaring:

"Section 1. Legislative findings and declaration. The legislature hereby finds and declares that reforms have been enacted to restrain increases in medical and dental malpractice premiums and related costs and to prevent medical and dental malpractice * * *

"In the meantime, the legislature finds and declares that upward pressures on already high malpractice premiums con-

tinue to threaten the public health by discouraging physicians and dentists from initiating or continuing their practice in New York and by contributing to the rising cost of health care as premium costs are passed along to health care consumers.

"The legislature finds and declares, therefore, that additional steps must be taken in the public interest to reduce the cost of malpractice insurance, such as providing the superintendent of insurance with the authority to establish rates for medical malpractice insurance and gradually requiring the issuance of only claims-made policies which will significantly reduce physician and health care system costs in the short-run and substantially enhance the reliability and predictability of malpractice insurance rate regulation in the future."

Governor Cuomo, who had participated very vigorously in seeking a solution to the problem, approved the legislation and in strong language endorsed the modus operandi for keeping down malpractice insurance rates. In his approval memorandum (1986 NY Legis Ann, at 161), he said, in part: "The bill focuses, moreover, on the insurance system itself. The previously enacted reform of the State's regulatory authority over liability insurance is complemented by provisions in this bill that gradually require the transition to 'claims-made' coverage, which will permit significantly lower premiums in the short run as well as greater actuarial certainty and predictability. In addition, the bill authorizes the Superintendent of Insurance to establish rates for a three-year period (July, 1985-June, 1988) that will provide a measure of badly needed premium stability as these reforms begin to take hold. In establishing these premium levels, the Superintendent is authorized to consider the availability of surcharges in future years that could be imposed, beginning in 1989, to restore any potential deficiency created during the premium stabilization period. The bill also continues to provide hospital-affiliated physicians with an additional one million dollars of protection to cover claims in excess of affordable insurance coverage— and provides this coverage in a manner that protects hospitals from a financial burden that they cannot fairly assume."

In an attempt to "significantly reduce physician and health care system costs in the short-run", the avowed purpose of the legislation, section 40 of Laws of 1986 (ch 266) provided: "§ 40. The superintendent of insurance shall establish rates for policies providing coverage for physicians and surgeons medical malpractice for the periods commencing July first, nineteen hundred eighty-five and ending June thirtieth, nineteen hundred eighty-eight. The superintendent shall direct insurers

to establish segregated accounts for premiums, payments, reserves and investment income attributable to such premium periods and shall require periodic reports by the insurers regarding claims and expenses attributable to such periods to monitor whether such accounts will be sufficient to meet incurred claims and expenses. On or after July first, nineteen hundred eighty-nine, the superintendent shall impose a surcharge on premiums to satisfy an actuarially projected deficiency that is attributable to the premium levels established pursuant to this section for such periods; provided, however, that such annual surcharge shall not exceed eight percent of the approved adequate rate and that such annual surcharges shall continue for such period of time as shall be sufficient to satisfy such deficiency * * * Surcharges collected from physicians and surgeons who were not insured during such policy periods shall be apportioned among all insurers in proportion to the premium written by each insurer during such policy periods. In the event any insurer that provided coverage during such policy periods is in liquidation, the property/casualty insurance security fund shall receive the portion of surcharges to which the insurer in liquidation would have been entitled. The surcharges authorized herein shall be deemed to be income earned for the purposes of section two thousand three hundred three of the insurance law."

In accordance with this legislation and faced with a pending request for a rate increase (and a recommendation by Honorable Matthew J. Jasen as Special Deputy Superintendent-Hearing Officer for, *inter alia,* an 86.7% increase in primary insurance premium rates for 1985-1986 over 1984-1985), the Superintendent promulgated the Sixth Amendment to Regulation No. 101 (11 NYCRR 70.8) establishing primary rates for such insurance of 14% for the 1985-1986 policy year and 9% for the 1986-1987 policy year. The Seventh Amendment additionally established excess rate levels for the 1985-1986 and 1986-1987 policy years.

Although he did not establish a surcharge percentage to be imposed starting in 1988-1989 (since such imposition must await a determination of the deficiency arising in prior years), the Superintendent directed the establishment of segregated accounts for premium reserves and investment income for each of the policy periods, so that deficiencies arising from each period and the amount of surcharges necessary could be ascertained more readily.

The petitioner Association brought this proceeding challenging the rates fixed by the Superintendent in Regulation No.

101. It contended the rates were inadequate and did not meet the statutory standards set in Insurance Law §§ 5505 and 2303 in that, *inter alia,* they are not actuarially sound, are not calculated to be self-supporting or based upon reasonable standards, are not consistent with the maintenance of reasonable reserves and surplus and, additionally, that the Superintendent's action in fixing the rates for 1985 through 1988 was arbitrary and capricious and without rational basis.

The Supreme Court referred the matter to Honorable Samuel J. Silverman to hear and report on the issues. In a detailed and comprehensive report, Justice Silverman agreed with the respondent that section 40 of Laws of 1986 (ch 266) authorized the consideration of the future surcharges in fixing rates for the July 1, 1985 to June 30, 1988 period. He further found that the primary rates fixed by the Superintendent in reliance upon his actuary's calculations were not arbitrary or capricious or without rational basis. As for the rates for excess policies, he recommended a remand for further explanation by the Superintendent since the record before him was insufficient. The Supreme Court rejected this report and set aside the determination of the Superintendent fixing the rates in Regulation No. 101, directing the Superintendent to fix the 1985-1988 rates in accordance with the Insurance Law. The majority of this court agrees with that judgment. I do not and would reverse, confirming Justice Silverman's report and denying the relief requested in the petition with respect to the primary rates for 1985-1988.

Petitioner, as indeed the nisi prius court, relies mainly on the provisions of the Insurance Law predating the enactment of section 40. Thus, section 5505 of the Insurance Law, which relates specifically to the petitioner, provides in pertinent part:

"§ 5505. Rates

"(a) The rates, rating plans, rating rules, rating classifications, territories and statistics applicable to the insurance written by the association shall be subject to article twenty-three of this chapter, giving due consideration to the past and prospective loss and expense experience for medical malpractice insurance written and to be written in this state, trends in the frequency and severity of losses, the investment income of the association, and such other information as the superintendent may require.

"(b) All rates shall be on an actuarially sound basis, be calculated to be self-supporting, be based upon reasonable

standards * * * The premiums shall be fixed at the lowest possible rates consistent with the maintenance of solvency of the association and of reasonable reserves and surplus therefor."

Section 2303 of the Insurance Law provides: "§ 2303. Standards for rates. Rates shall not be excessive, inadequate, unfairly discriminatory, destructive of competition or detrimental to the solvency of insurers. In determining whether rates comply with the foregoing standards, the superintendent shall include all income earned by such insurer and any insurer controlling or controlled by such insurer or under common control by or with such insurer on all its investments of any kind and wherever located."

As the Referee found, the primary insurance rates as fixed by the Superintendent *without* the imposition of any surcharges are inadequate and would not meet the statutory standards set out above.

However, section 40 of Laws of 1986 (ch 266) expressly authorized the Superintendent to set the rates for the 1985-1988 policy years at levels *below* those authorized solely by consideration of the prior statutory criteria *and to make up any ongoing deficit by calculating and including the anticipated surcharges*. Thus, section 40 explicitly provides: "The surcharges authorized herein shall be deemed to be income earned for the purposes of section two thousand three hundred three of the insurance law." Section 2303 provides, *inter alia:* "In determining whether rates comply with the foregoing standards, the superintendent shall include all income earned by such insurer". Thus, the surcharges were correctly utilized by the Superintendent to determine income when he set the rates for the 1985-1988 period.

Further, section 40 provides that the purpose of the surcharges is to satisfy deficiencies "attributable to the premium levels established pursuant to this section for such periods" (i.e., July 1, 1985 to June 30, 1988). It also provides for allocation of amounts collected on the surcharge among insurers based on the extent of coverage provided during the 1985-1988 period. These provisions only make sense, as noted by the Referee in his report, if the rates for which the surcharges are considered income are the rates for the period 1985-1988.

Section 5505 (b) requires rates set by the Superintendent for petitioner to be self-supporting but also fixed "at the lowest possible rates consistent with the maintenance of solvency of the association and of reasonable reserves and surplus therefor". The inclusion of the surcharge income, which is ex-

pressly sanctioned by the Legislature, fulfills this purpose of achieving the lowest possible rates together with insuring that the solvency of the Association is maintained. In this regard, respondent's chief actuary testified that in his opinion, on the basis of the rates established and with the 8% surcharge after 1989, the petitioner will have sufficient cash to meet its obligations as they mature at least through the year 2010, i.e., *beyond* the years at which the deficit for 1985-1988 would have been made up.

With this interpretation, section 40 of Laws of 1986 (ch 266) and sections 2303 and 5505, the preexisting statutes, are harmonized and all of the respective provisions effectuated *(see, Matter of Guardian Life Ins. Co. v Chapman,* 302 NY 226, 231). Accepting petitioner's interpretation, section 40 means nothing and does nothing and the plain intent of the Legislature and Governor are disregarded. *(See,* L 1986, ch 266, § 1; Governor's approval mem, *op. cit.,* at 161.)

We have previously noted in another matter involving the Superintendent's implementation of the Insurance Law: "Special Term substituted its judgment for that of the Superintendent. It was without authority to do so *(Matter of Procaccino v Stewart,* 25 NY2d 301). The Superintendent is vested by the statute with broad power and responsibility to implement the Insurance Law *(Matter of New York Public Interest Research Group v New York State Dept. of Ins.,* 66 NY2d 444; *Ostrer v Schenck,* 41 NY2d 782). As these and other cases hold, a determination of the Superintendent is to be upheld by the courts unless it lacks a rational basis *(Matter of American Tr. Ins. Co. v Corcoran,* 105 AD2d 30, *affd* 65 NY2d 828)." *(Matter of Schwartz v Corcoran,* 118 AD2d 355, 361.)

It hardly seems necessary to address the constitutional arguments advanced by respondent. The history of the efforts by Legislatures and Governors to solve this problem, the factual record before the Superintendent, the applicable legal standards for judging the constitutional claim, long-standing decisions of the Court of Appeals and Federal appellate courts, including the Supreme Court, that rejected similar constitutional attacks on legislation which States employ to regulate insurance under their police power within constitutional constraints, make such contentions nugatory. *(See,* dissent in *Medical Malpractice Ins. Assn. v Cuomo,* 138 AD2d 177, 187.)

As found by the Referee, the Regulation adopted by the Superintendent dealing with the primary rates for the 1985-1988 period had a rational basis and was not arbitrary or capricious. *[See,* 137 Misc 2d 785.]